UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

                                 Civil Action 2:13-md-2433
                                 JUDGE EDMUND A. SARGUS, JR.
                                 Magistrate Judge Elizabeth P. Deavers

**This document relates to:**

*Travis Abbott and Julie Abbott, et al. v. E. I. du Pont de*
*Nemours and Co., et al.*, Case No. 2:17-cv-998

## DISPOSITIVE MOTIONS ORDER NO. 43

This matter is before the Court on Defendant's Motion for Application of Ohio Tort Reform, and for Remittitur or a New Trial (ECF No. 233), Plaintiffs' Memorandum in Opposition (ECF No. 237), and Defendant's Reply (ECF No. 238). For the reasons that follow, the Court **GRANTS IN PART, DENIES IN PART, AND FINDS MOOT IN PART** Defendant's Motion.

### I.

This case is part of the multidistrict litigation ("MDL") *In Re: E. I. Du Pont de Nemours and Company C-8 Personal Injury Litigation* ("C-8 Personal Injury MDL"). The individual plaintiffs in the C-8 Personal Injury MDL are all part of a class ("*Leach* Class") certified nearly twenty years ago in a West Virginia state court. The *Leach* Class consists of approximately 80,000 residents of Ohio and West Virginia who drank water contaminated by releases of a chemical referred to as C-8 from DuPont's Washington Works facility near Parkersburg, West Virginia.

All C-8 Personal Injury MDL cases are subject to a settlement agreement executed over 15 years ago ("*Leach* Settlement Agreement") between the *Leach* Class and Defendant Du Pont. The *Leach* Class consisted of those individuals who for at least one year, had "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from Washington Works." (*Leach* Settlement Agreement § 2.1.1, MDL ECF No. 820-8.) After a massive epidemiological study that lasted over seven years and cost over $24 million, a Science Panel in 2012 delivered findings that linked C-8 to six human diseases, including kidney cancer and testicular cancer ("Linked Diseases").

The *Leach* Settlement Agreement provided for the over 3,500 individual *Leach* Class members who suffered from one or more of the of the Linked Diseases to file individual personal injury cases against DuPont. As to the remaining 70,000-plus *Leach* Class members with any illness other than the Linked Diseases, DuPont was "forever discharge[d] from any and all claims, losses, damages, attorneys' fees, costs, and expenses, whether asserted or not, accrued or not, known or unknown, for personal injury and wrongful death . . . ." (*Leach* Settlement Agreement § 3.3, MDL ECF No. 820-8.) DuPont moved to have the cases alleging Linked Diseases centralized into the C-8 Personal Injury MDL and the Judicial Panel on Multidistrict Litigation granted the request in April 2013.

## A.    FIRST GLOBAL SETTLEMENT CASES

This Court held four trials, each lasting for over a month, of C-8 Personal Injury MDL cases with three trials going to verdicts, all in favor of the plaintiffs. DuPont appealed the verdict from the first trial to the United States Court of Appeals for the Sixth Circuit. The appeal received full briefing, assignment of a judicial panel, and oral argument before the panel. DuPont withdrew the appeal in February 2017, before a decision was issued.

On the same day the appeal was withdrawn, the fourth trial was ended in its third week without a verdict from the jury as part of a global settlement. DuPont filed notice with the Security and Exchange Commission of a $670.7 million global settlement of the 3500-plus then-pending cases, all of which were ultimately dismissed.

## B.     SECOND GLOBAL SETTEMENT CASES AND *ABBOTT*

Since the global settlement, 100-plus cases have been filed in the C-8 Personal Injury MDL. The Abbotts' case was the first of this group, tried in a consolidated trial with another MDL case, *Angela Swartz and Teddy Swartz v. E. I. du Pont de Nemours and Company*, Case No. 2:18-cv-00136. Plaintiffs Mrs. Swartz and Mr. Abbott contended that the C-8 from DuPont's Washington Works plant that was released into their drinking water caused Mr. Abbott to twice develop testicular cancer, requiring removal of both of his testicles, and Mrs. Swartz to develop kidney cancer, requiring removal of part of her kidney. Both Mrs. Abbott and Mr. Swartz brought loss of consortium claims.

After a trial that lasted over a month, both sides presented motions for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. Relevant to the motion at bar, this Court held that Mrs. Abbott "is covered by the Tort Reform Act" but that her claims are "subject to the exception for substantial physical deformity, loss of use of a limb, or loss of a bodily organ system." (Trial Tr. at 12–15, Vol. 21, ECF No. 205.)

After deliberations, the jury delivered verdicts in favor of the Abbotts, awarding $40 million in damages to Mr. Abbott and $10 million to Mrs. Abbott. The jury could not come to agreement on the claims filed by Mrs. and Mr. Swartz. The Court accepted the *Abbott* verdict and declared a mistrial in *Swartz*. Judgment was subsequently entered to reflect the jury verdicts.

DuPont timely filed post-trial motions in the *Abbott* case: Defendant's Motion for a Mistrial (ECF No. 178) and Defendant's Motion for Application of Ohio Tort Reform, and for Remittitur or a New Trial (ECF No. 233). This Court denied DuPont's request for a mistrial. *In re: E. I. Du Pont De Nemours and Co. C-8 Personal Injury Litig.*, 2:13-MD-2433, 2020 WL 7863331 (S.D. Ohio Dec. 31, 2020).

On January 22, 2021, DuPont informed the Court and issued a press release indicating that all of the second group of C-8 Personal Injury MDL cases were resolved in a global settlement, with the exception of *Abbott*. Because *Abbott* was excluded from the global settlement, DuPont's Motion for Application of Ohio Tort Reform, and for Remittitur or a New Trial is ripe for review.

## II.

In a diversity case, federal law governs the district court's decision whether to grant a new trial and it is within the sound discretion of the trial court to make this determination. *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000) (citing *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 & n. 20 (6th Cir. 1991)). DuPont moves under Federal Rules 59(a), 59(e), and 50(b) of the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 59 governs motions to amend or alter a judgment. Fed. R. Civ. P. 59(e). According to the text of the rule, a new trial is permissible "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Generally, a court may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damage award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte*, 215 F.3d at 637. "However, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be

4

accepted if it is one which could reasonably have been reached." *Id.* (quoting *Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984)) (internal citations omitted).

Rule 50 of the Federal Rules of Civil Procedure permits a litigant who requests judgment as a matter of law under 50(a), as DuPont did here, to "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

### III.

DuPont asks the Court to (A) "apply the Ohio Tort Reform Act, Ohio Revised Code § 2315.18(B)(2), to Plaintiff Julie Abbott's noneconomic loss of consortium claim and reduce the award to $250,000," and (B) "order remittitur of Mr. Abbott's $40 million award and, in the alternative as to Mrs. Abbott, order remittitur of Mrs. Abbott's $10 million award, or grant a new trial [only on compensatory damages] if Plaintiffs do not accept the reduction." (Def.'s Mot. at 1, ECF No. 233.) In other words, DuPont asks this Court to affirm its prior finding that the Tort Reform Act applies to Mrs. Abbott's claim and to reconsider whether the she meets the exception to its application.

In their Memorandum in Opposition to DuPont's Motion, Plaintiffs request that the Court reconsider whether the Tort Reform Act applies to Mrs. Abbott, contending it does not. Plaintiffs further request the Court to affirm that, even if the Act applies, Mrs. Abbott is entitled to application of the catastrophic injury exception.

A.      **Ohio's Tort Reform Act**

Under the Ohio Tort Reform Act of 2004, effective April 7, 2005, the Ohio Revised Code was amended to, *inter alia*, cap the amount of noneconomic damages recoverable in tort actions. Ohio Rev. Code §§ 2315.1–21.  Under the Tort Reform Act, a "judgment for noneconomic damages" may not "exceed the applicable R.C. 2315.18(B)(2) damage cap, . . . [e]xcept as provided in R.C. 2315.18(B)(3)."  *Simpkins v. Grace Brethren Church of Delaware, Ohio*, 149 Ohio St. 3d 307, 321 (2016) (citing Ohio Rev. Code § 2315.18(E)(1)).  The applicable provision limits noneconomic damages to $250,000, and the statute explicitly defines "noneconomic loss" to include "loss of society, consortium, [and] companionship."  Ohio Rev. Code § 2315.18(A)(4), (B)(2).

1.      **Application of the Ohio Tort Reform Act**

DuPont asks this Court to apply the Ohio Tort Reform Act's compensatory damages cap to the $10 million verdict awarded to Mrs. Abbott on her loss of consortium claim.  Ohio Rev. Code § 2315.18(B)(2).  DuPont contends that the events giving rise to Mrs. Abbott's loss of consortium are Mr. Abbott's cancer and subsequent infertility, which occurred after their 2013 marriage, eight years after the effective date of Ohio's Tort Reform Act.

Plaintiffs respond, arguing:

> Because DuPont's tortious conduct and Travis's injury-inducing exposure occurred prior to the effective date of the Act, neither of the Act's damages limitations should apply to his and Julie's claim in the first place.  Additionally, since Julie's claim is wholly derivative of Travis' underlying claim – to which the Ohio Tort Reform Act does not apply – Julie Abbott's consortium damages should also not be subject to any statutory Tort Reform caps.

(Pls.' Mem. in Opp. at 4, ECF No. 237.)

It is true that the evidence submitted at trial showed that the date of the conduct giving rise to both of Mr. Abbott's cancers, and therefore his personal injury claim, occurred when he

drank water that contained C-8 that DuPont had released into the drinking water supplies beginning in the 1950s and ending in 2006 (just months after the effective date of the Tort Reform Act) when DuPont began filtering the C-8 out of the water. As this Court first explained in Dispositive Motions Order No. 10, "Courts have routinely held that the relevant date for determining whether the [Ohio Tort Reform Act] applies is the date the conduct giving rise to the plaintiff's cause of action occurred." *In re: E. I. Du Pont De Nemours and Co. C-8 Personal Injury Litig.*, CV 2:13-MD-2433, 2015 WL 10936122, at *2 (S.D. Ohio Sept. 8, 2015) (quoting *Heffelfinger v. Connolly*, No. 3:06-CV-2823, 2009 WL 112792, at *3 (N.D. Ohio Jan. 15, 2009); *see also Blair v. McDonagh*, , 177 Ohio App.3d 262, 282 (Ohio Ct. App. 2008) ("[A] court cannot apply [the Tort Reform Act] to causes of action that arose before the statute's effective date even if some of the conduct giving rise to the cause of action occurred after the [statute's] effective date.")). Thus, Plaintiffs are correct that both DuPont's conduct and Mr. Abbott's C-8 exposure occurred prior to the effective date of the Ohio Tort Reform Act and therefore, the Act does not apply to the claims of Mr. Abbott.

The inapplicability of the Tort Reform Act to Mr. Abbott's claim, however, does not also establish the inapplicability to Mrs. Abbott's claim. That is, the Court must determine the date her claim arose for the purpose of application of the Act. The events giving rise to Mrs. Abbott's cause of action are not the same as the events that gave rise to Mr. Abbott's claim for relief. Mrs. Abbot's claim for the loss of her husband's consortium occurred as a result of Mr. Abbott's second cancer, oriechtomy, and subsequent infertility, all of which occurred during the marriage, years after the effective date of the Tort Reform Act. Indeed, the jury verdict in favor of Mrs. Abbott found that she was entitled to damages for the loss of consortium she suffered as a result of Mr. Abbott's second cancer, which occurred during their marriage, but not the first cancer,

which occurred before their marriage (and before Ohio reformed its tort system to limit damages). (Jury Verdict Form at 2, ECF No. 183.)

Further, while Plaintiffs are correct that a loss of consortium claim is derivative, DuPont accurately points out that in Ohio a loss of consortium claim is a separate injury personal to the spouse. *See Bowen v. Kil-Kare, Inc.*, 63 Ohio St. 3d 84, 91 (1992). In *Bowen*, the Ohio Supreme Court stated that "a wife's claim for loss of consortium is her *separate property* which grows out of an injury to her *personal rights* and that she may pursue the claim in her own name." *Id*. (citing, *inter alia*, *Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St. 2d 65, 69 (1970)) (emphasis in original). The Ohio Supreme Court has explained:

> "Consortium consists of society, services, sexual relations and conjugal affection which includes companionship, comfort, love and solace." Even though a loss of consortium claim is derivative in that it is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury, it is nonetheless legally separate and independent from the claim of the spouse who suffered the bodily injury."

*Schaefer v. Allstate Ins. Co.*, 76 Ohio St. 3d 553, 557 (1996), *superseded by statute on other grounds* (internal citations and quotation marks omitted).

Thus, the Court finds no reason to depart from its prior conclusion that the Tort Reform Act applies to Mrs. Abbott's loss of consortium claim. Therefore, Mrs. Abbott's damages award must be capped at $250,000 unless she fits into one of the exceptions provided in Ohio Revised Code § 2315.18(B)(3).

### 2.    Exceptions to the Tort Reform Act

The Ohio Tort Reform Act contains a catastrophic injury exception to damage caps, which provides the following:

> (3) There shall not be any limitation on the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action to

8

recover damages for injury or loss to person or property if the noneconomic losses
of the plaintiff are for either of the following:

> (a) Permanent and substantial physical deformity, loss of use of a
> limb, or loss of a bodily organ system;

> (b) Permanent physical functional injury that permanently prevents
> the injured person from being able to independently care for self and
> perform life-sustaining activities.

Ohio Rev. Code § 2315.18(B)(3).

Plaintiffs assert that "[t]he clear and unambiguous language of the statute allows

exceptions to damage caps for consortium claims, like Julie's, where a plaintiff has suffered

permanent and substantial deformity and/or loss of a bodily organ system, which was

undisputedly suffered [by Mr. Abbott]." (Pls.' Mem. in Opp. at 5, ECF No. 237.) Additionally,

Plaintiffs state:

> Even assuming *arguendo* that the first damage cap exception does not
> apply to consortium claims where the consortium plaintiff has not personally
> suffered "a permanent and substantial deformity" or "loss of a bodily organ
> system," this case is unique in that Julie herself has suffered the loss of a bodily
> organ system. With the surgical castration of her spouse that was caused by the C8
> induced cancer, DuPont has deprived Julie of the ability to procreate with Travis.
> The reproductive system is a unique bodily organ system that cannot function
> without both a working male and working female component. By destroying
> Travis' reproductive system, DuPont has also destroyed Julie's ability to conceive
> biological children with her husband and has thus deprived the entire marital entity
> of a bodily organ system.

*Id*. at 7 (relying on *Deems v. W. M. R. Co.*, 231 A.2d 514, 522 (Md. Ct. Spec. App. 1967)).

DuPont disagrees, arguing that the statutory text shows that the subsections within the

catastrophic injury exception do not apply to Mrs. Abbott's loss of consortium claim.

Specifically, DuPont argues that subsection (a) refers to the permanent and substantial

deformities of "the plaintiff," who is Mrs. Abbott. And as to subsection (b), while the "injured

person" language expands it to cover injuries to either the plaintiff herself or to any other person

who was injured, potentially allowing a plaintiff acting as a spouse, parent, or other caregiver for someone with an incapacitating physical injury to avoid the damages caps, Mr. Abbott did not suffer an incapacitating physical injury. (Def.'s Mot. at 9, ECF No. 233; Def.'s Reply at 10, ECF No. 238.) DuPont's arguments are well taken.

"In matters of statutory interpretation, [courts] look first to the text and, if the meaning of the language is plain, then 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1106 (6th Cir. 2010) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)). Here, the Court finds the language of the provisions at issue unambiguous and will enforce them according to their terms.

Subsection (a) of § 2315.18(B)(3) applies where "the noneconomic losses *of the plaintiff are for* . . . [p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system." Ohio Rev. Code § 2315.18(B)(3)(a) (emphasis added). The Ohio Supreme Court describes the exceptions as providing "limitless noneconomic damages *for those suffering catastrophic physical injuries* pursuant to the exceptions in R.C. 2315.18(B)(3)." *Id.* (emphasis in original). Ohio's high court explained that it had previously "held that the General Assembly distinguished between plaintiffs who suffered the catastrophic physical injuries specified in R.C. 2315.18(B)(3) and plaintiffs suffering other injuries based on the conclusion that the injuries specified in R.C. 2315.18(B)(3) 'offer more concrete evidence of noneconomic damages and thus calculation of those damages poses a lesser risk of being tainted by improper external considerations.'" *Simpkins*, 149 Ohio St. 3d at 318 (quoting *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 483 (2007)).

While Mr. Abbott clearly meets the catastrophic injury exception as the plaintiff of his personal injury claim, Mrs. Abbott is the plaintiff of her loss of consortium claim and did not herself suffer physical deformity, loss of use of a limb, or loss of a bodily organ system.  Thus, she does not satisfy the plain language of subsection (a).  Plaintiffs' arguments otherwise are unconvincing.  That is, Plaintiffs contend:

> If, as DuPont argues, a plaintiff is only free from the damages cap on a loss of consortium claim when the same plaintiff has a physical injury, then there is no purpose for including loss of consortium in the § 2315.18 description at all. In such a case, the plaintiff's injuries are separate—one based on physical harm to her and one on derivative, physical harm to her husband. It makes no sense to deem the **harm to her husband** worthy of exception **only** when the consortium plaintiff **herself** also suffers substantial physical deformities. The reason is simple: loss of the "society, consortium, and companionship" a **husband** offers is not measured by his **wife's** physical injuries. Unsurprisingly, DuPont's nonsensical approach finds zero support in the statutory text. By DuPont's logic, virtually no consortium plaintiff could ever make use of the exception, and yet the Act includes in its definition of noneconomic losses "loss of society, consortium, companionship, [and] care." Ohio Rev. Code §2315.18(A)(4). The legislature could have made this limiting distinction if it desired or said the first exception did not apply to derivative plaintiffs, but it did not.

(Pls.' Mem. in Opp. at 6, ECF No. 23) (emphasis in original).

DuPont, however, does not argue that a plaintiff is only free from the damages cap on a loss of consortium claim when the same plaintiff has a physical injury.  Nor is the harm to the spouse of a loss of consortium plaintiff worthy of exception only when the consortium plaintiff herself also suffers substantial physical deformities.  Instead, DuPont argues that to fit into the exception provided in subsection (a), there must be physical harm to the plaintiff who seeks to utilize the exception.  By way of application here, Mr. Abbott would be entitled to the exception set forth in subsection (a) because he as the plaintiff of his claim did suffer a catastrophic physical injury.  Mrs. Abbott, however, did not suffer a catastrophic physical injury as the

11

plaintiff of her consortium claim and is therefore not entitled to the exception set forth in subsection (a).

Likewise, DuPont's argument does not leave the exception unavailable to a consortium plaintiff. A consortium plaintiff may use the exception set forth is subsection (b). This is because subsection (b) applies where the non-economic losses of the plaintiff "*are for*" a permanent physical functional injury that occurs to "*the injured person*." Ohio Rev. Code § 2315.18(B)(3)(b) (emphasis added). This subsection draws a distinction between the "plaintiff" and the physically "injured person," so that a plaintiff does not have to be herself physically injured. The "injured person" language expands subsection (b) to cover injuries to either the plaintiff herself or to any other person who was injured. Subsection (a) does not have similar language. The distinction between these two subsections potentially allows a consortium plaintiff to avoid the damages caps when the injured person suffered an incapacitating physical injury.

In the instant action, it is undisputed that Mr. Abbott's injuries, while catastrophic, did not render him incapacitated and unable to independently care for himself. Plaintiffs nevertheless argue that Mrs. Abbott satisfies the exception in subsection (b) because Mr. Abbott's reproductive system loss is a marital loss of a bodily organ system that she herself suffered. The only case Plaintiffs cite in support of this position is a Maryland decision, *Deems*, 231 A.2d 514, that regarded loss of consortium as joint damage to the marriage. The Ohio Supreme Court has rejected *Deems*' premise, explaining:

> The argument has been advanced in some jurisdictions that an action for the loss of consortium should be regarded as a single damage to the marital relationship. *Deems v. Western Maryland Ry. Co.* (1967), 247 Md. 95, 231 A.2d 514. This is another fiction. It is a throw-back to the ancient common law which held to the concept that when two persons married they were merged into one person. Although that concept may still have many symbolic values, it is not a

12

realistic concept today. When a person is injured either intentionally or negligently, to the extent that such person can no longer be a companion and is no longer capable of giving love, affection, society, comfort and sexual relations to his or her spouse, that spouse has suffered a direct and a real personal loss.

The fiction that only a single marital relationship has been damaged is simply a hold-over from the common law which held that when a man and a woman married, the wife's personality merged with the husband's, and that she no longer was a person but only a chattel with no personality, no property and no legally recognized feelings or rights.

*Clouston v. Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St. 2d 65, 74 (1970).

Accordingly, with the benefit of post-trial briefing on this issue, the Court concludes that Mrs. Abbott's loss of consortium claim is not covered by the catastrophic injury exceptions provided in the Ohio Tort Reform Act.

### 3. Conclusion – Ohio Tort Reform Act

Based on the forgoing, the Court concludes that Mrs. Abbott's loss of consortium claim is subject to the cap established in Ohio's Tort Reform Act and that no statutory exception applies. Thus, the Court reduces the $10,000,000 jury award to $250,000 as required by the Ohio Tort Reform Act.

### B. Remittitur

DuPont moves for a reduction of "Mr. Abbott's award to $7.5 million," a reduction of "Mrs. Abbott's award to $500,000," and "a new trial limited to the sole issue of Plaintiffs' non-economic compensatory damages . . . . if Plaintiffs do not accept the remittitur." (Def.'s Mot. at 14, ECF No. 233; Def.'s Reply at 18, ECF No. 238.) The Court need not address remittitur with regard to Mrs. Abbott because her award has already been reduced by application of Ohio's Tort Reform Act to less than the amount requested by DuPont. Therefore, this request has been rendered moot.

As to a request for reduction of a jury's award of damages, the role of a federal court exercising its diversity jurisdiction is "to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59 [of the Federal Rules of Civil Procedure], whether a new trial or remittitur should be ordered." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435 (quoting *Browning-Ferris Indus. of Vt., Inc.v. Kelco Disposal, Inc.*, 492 U.S. 257, 279, n.25 (1989)); *Taglieri v. Monasky*, 1:15 CV 1052, 2018 WL 7575018, at *2 (N.D. Ohio May 15, 2018), *aff'd* 767 F. App'x 597, 604 (6th Cir. 2019). Under Federal Rule 59, a new trial is warranted where a "seriously erroneous result" is shown by: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Fresh v. Entm't U.S.A. of Tenn., Inc.*, 340 F. Supp. 2d 851, 855–56 (W.D. Tenn. 2003) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996)).

"As a general rule, [the Sixth Circuit] has held that 'a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (quoting *Farber v. Massillon Bd. of Educ.,* 917 F.2d 1391, 1395 (6th Cir. 1990)). "A trial court is within its discretion in remitting a verdict only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Id.* "If there is any credible evidence to support a verdict, it should not be set aside." *Id.* "The trial court may not substitute its judgment or credibility determinations for those of the jury." *Farber*, 917 F.2d at 1391.

In Ohio, courts find that, "[b]ecause the amount of damages in a personal-injury action 'is a matter within the province of the jury,' *Carter v. Simpson*, 16 Ohio App. 3d 420, 423 (Ohio App. 10th Dist. 1984), remittitur is proper only 'if the jury's award is so excessive as to appear to be the result of passion or prejudice, or if the amount awarded is against the manifest weight of the evidence.' *Menda ex rel. Justin v. Springfield Radiologists, Inc.*, No. 2001-CA-91, 2002 WL 31761562, at *2 (Ohio Ct. App. Dec. 6, 2002)." *Matus v. Lorain County Gen. Health Dist.*, 707 F. App'x 304, 314 (6th Cir. 2017). An Ohio statute is also used to determine whether an award of noneconomic compensatory damages in a tort action is excessive, and is directed at the same considerations developed under Rule 59. Ohio Revised Code § 2315.19 provides in relevant part:

> (A) Upon a post-judgment motion, a trial court in a tort action shall review the evidence supporting an award of compensatory damages for noneconomic loss that the defendant has challenged as excessive. That review shall include, but is not limited to, the following factors:
>
> > (1) Whether the evidence presented or the arguments of the attorneys resulted in one or more of the following events in the determination of an award of compensatory damages for noneconomic loss:
> >
> > > (a) It inflamed the passion or prejudice of the trier of fact.
> > >
> > > (b) It resulted in the improper consideration of the wealth of the defendant.
> > >
> > > (c) It resulted in the improper consideration of the misconduct of the defendant so as to punish the defendant improperly or in circumvention of the limitation on punitive or exemplary damages as provided in section 2315.21 of the Revised Code.
> >
> > (2) Whether the verdict is in excess of verdicts involving comparable injuries to similarly situated plaintiffs;

> (3) Whether there were any extraordinary circumstances in the record to account for an award of compensatory damages for noneconomic loss in excess of what was granted by courts to similarly situated plaintiffs, with consideration given to the type of injury, the severity of the injury, and the plaintiff's age at the time of the injury.

Ohio Rev. Code § 2315.19.

Thus, to encompass the entire state and federal framework, the Court will review the record and consider if the jury's award (1) was unfair because it was motivated by passion, prejudice, bias or a desire to punish DuPont; (2) whether there were any extraordinary circumstances and if the verdict was supported by the weight of the evidence; (3) whether there were improper considerations of the wealth of DuPont; and (4) whether the damages awarded were excessive compared to similar cases or similarly situated plaintiffs.

### 1.    Passion, Prejudice, Bias, Desire to Punish DuPont

DuPont argues that the jury award "shows that the jury lost its way on compensatory damages, and likely resulted from improper passion or prejudice." (Def.'s Mot. at 14, ECF No. 233.) DuPont continues, concluding that, "[t]he cause of that prejudice was readily apparent at trial: Plaintiffs' counsel [during closing arguments] inflamed the jury to improperly punish DuPont." (*Id.*) (citing parenthetically Closing Arguments, Feb. 26, 2020 Trial Tr. at 36:3-16, Vol. 22; ECF No. 206) ("[I]s everybody else lying except for DuPont?"), *id.* at 37:1-3 ("[I]t's finally time to stop hiding the ball and to take responsibility for what you did to these people."); *id.* at 186:6-20 (arguing at length that justice is unavailable and that "perfect justice" "takes large numbers"); *id.* at 25:12-14 (asking jury "[t]o sit in judgment of [DuPont's] actual malice [and] conscious disregard for the health and safety of their neighbors"), *id.* at 82:10-17 ("I would ask you to award $120 million and write $105 million in the blank for Travis and $15 million in the blank for Julie.")). DuPont's arguments are not well taken.

16

It is difficult, if not impossible, to consider the jury award to the Abbott's as the jury's desire to punish DuPont in light of the fact that it could not decide whether DuPont was liable for Mrs. Swartz's cancer or Mr. Swartz's loss of consortium.  If the jury was inflamed by passion or prejudice sufficient to cause it to want to punish DuPont, it seems unlikely that the jury would have given up the opportunity to do so in the Swartz's case.  Additionally, if the jury had been driven by malice, as DuPont suggests, it stands to reason that the same malice would have been found on the interrogatory that was provided to the jury, but it was not.  As discussed in more detail below, the jury declined to find malice.

In any event, Ohio law does not support DuPont's argument that the alleged misconduct of Plaintiffs' counsel during closing arguments inflamed the jury such that it was prompted to punish DuPont.  An Ohio appellate court recently reviewed a request by a defendant to grant a new trial under Ohio Rule 59 and lower a jury award as excessive under Ohio Revised Code § 2315.19 in a case that neither party cites, but that the Court finds helpful.  *See Torres v. Concrete Designs Inc.*, 134 N.E.3d 903 (Ohio App. 8th Dist. 2019), *appeal not allowed,* 157 Ohio St. 3d 1523 (2019), *appeal not allowed,* 157 Ohio St. 3d 1528 (2020), *reconsideration denied,* 158 Ohio St. 3d 1425 (2020).  *Torres* fleshes out the nature of the analysis required when a defendant argues, as does DuPont here, that the alleged misconduct of Plaintiffs' counsel during closing arguments caused an excessive verdict.

In *Torres*, on appeal of a $42.4 million verdict, the defense argued that numerous statements made by plaintiffs' counsel during closing arguments were improper, such as "defense counsel is not telling you the truth about the law. . . . In fact, I think she's very plainly not telling the truth about the law."; "There's only one party here trying to deceive you, to do wordsmithing, to distort the facts in this case and that is [defense counsel and defendant].";

"While [plaintiffs] were in the hospital, . . .[defendant] got a jump strategically maneuvering in this case and what happened here in this courtroom."; "[W]ithin three weeks of this particular accident, [defendant] had formulated his troops and started working towards strategically defending this case."; "We had to file a lawsuit in order to find out what was truly behind all of the issues and statements that were raised in the police report, because some statements didn't make sense, some statements made sense, so we filed a lawsuit . . ."; Asking juror if they would "take the job of being [passenger in the accident] for an annual salary of $ 365,000[,]" and followed by saying "[t]he answer is probably not." *Id*. at 914–16.

In denying the defendant's request, the *Torres* court explained that "a judgment will not be reversed on the grounds of misconduct in closing arguments unless the circumstances are of such reprehensible and heinous nature as to constitute prejudice." *Id*. at 912.  The court then went on to determine whether counsel "inflamed the jury's passion and prejudice" in such a reprehensible and heinous way as to constitute prejudice.  *Torres* "first noted that as a general rule, '[c]ounsel is allowed wide latitude in presenting oral argument although at all times counsel is subject to the supervision of the trial judge." *Id*. (citing *Di v. Cleveland Clinic Found.*, 2016-Ohio-686, 60 N.E.3d 582, ¶ 104 (8th Dist.), citing *Yerrick v. E. Ohio Gas Co.*, 119 Ohio App. 220, 223, 198 N.E.2d 472 (9th Dist. 1964)).  "[T]he determination of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court."  *Id.*

In this regard, *Torres* addressed the fact that the defendant failed to object to most of the remarks it asserted were objectionable.  *Id*.  "Ordinarily, in order to support a reversal of a judgment on the ground of misconduct of counsel in his opening statement and closing argument to the jury, it is necessary that a proper and timely objection be made to the claimed improper

remarks so that the court may take proper action thereon." *Id*. (quoting *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 40).

Similarly, here, the trial transcript reflects that DuPont failed entirely to object to the statements made in closing argument about which it now complains. Instead, DuPont contends that whether it objected or not does not relieve this Court from undertaking the analysis to determine whether the award was excessive. (Def.'s Reply at 13, fn. 8) (stating "§ 2315.19(A) *requires* trial courts applying Ohio law to undertake this analysis: 'a trial court in a tort action *shall* review' the verdict if the defendant 'has challenged [an award] as excessive'" (emphasis added by DuPont)). This Court is, however, undertaking the analysis, but must do so under the proper standard. *Torres* explained:

> In our review of the extensive trial transcript, we note that appellants *failed to object* to the large majority of remarks made in opening statements and closing arguments with which they now take issue. . . . A party must generally raise a timely objection to preserve a claim of error. *Villella v. Waikem Motors, Inc.,* 45 Ohio St.3d 36, 39-40, 543 N.E.2d 464 (1989). Failure to do so prevents reversal absent gross and persistent abuse of counsel's privilege in closing argument.

*Id.* at 913 (emphasis added). Thus, because of DuPont's failure to object, this Court must determine whether the conduct of counsel at issue was a "gross and persistent abuse of counsel's privilege in closing argument." *Id*.

In this endeavor, the *Torres* court first indicated that the nature of a closing argument is "not evidence" and the jury was so instructed. *Id*. (citing *Peffer v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, 2011 WL 345958, ¶ 27, citing *State v. Spaqi*, 8th Dist. Cuyahoga No. 69851, 1997 WL 83120 (Feb. 27, 1997)).

Similarly, the *Abbott* jury was instructed by this Court that the arguments made by the attorneys are not evidence:

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: (1) statements and arguments of the attorneys; (2) questions and objections of the attorneys;

. . . .

Statements and arguments of the lawyers are not evidence in the case . . . .

(Final Jury Instructions at 7, 9, ECF No. 244.)

Therefore, as it was in *Torres*, here "the jury is presumed to follow the proper instructions of the trial court." *Torres,* 134 N.E.3d at 918 ("Indeed, the presumption always exists that the jury has followed the instructions given to it by the trial court.") (citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637; *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032).  The Sixth Circuit too has "often stated our [circuit's] presumption that jurors follow their instructions."  *U.S. v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001) (citing several examples, including *Washington v. Hofbauer,* 228 F.3d 689, 706 (6th Cir. 2000), and *Barnes v. Owens–Corning Fiberglas Corp.,* 201 F.3d 815, 822 (6th Cir. 2000)).

Moreover, reviewing the remarks about which DuPont objects, and the Court set forth above, the Court finds that even if DuPont had objected, the statements were not appealing to the jurors to abandon their impartiality.  These remarks appear to be an attempt to assist the jurors in quantifying the damages amount or providing a means of quantifying the damages amount.  And, the Court is similarly unpersuaded that Plaintiffs' counsel grossly or persistently abused their privileges in closing argument.  This Court notes that, the *Torres* court found the same even when several of the statements made by counsel were improper.

Consequently, the Court finds that the conduct of Plaintiffs' counsel was not heinous or reprehensible so that they could have caused the jury to abandon a position of impartiality.  The

20

remarks were nothing more than trial tactics and strategy and were not inappropriate. Therefore, the statements caused no legal prejudice to DuPont.

### 2. Extraordinary Circumstances, Weight of the Evidence, Reasonableness

As to the second group of factors for consideration under Ohio Revised Code § 2315.19 and Federal Rule of Civil Procedure 59, the Court considers whether the weight of the evidence supports the jury's damages award or whether the award was excessive or unreasonable. DuPont argues that, "[w]hile the injuries that Mr. Abbott endured were serious and life changing, they did not involve death or permanent disabling injuries" and the evidence does not support the jury award. This Court disagrees.

The Sixth Circuit directs:

> Generally, when a district court determines that a verdict is against the weight of the evidence, that court has a duty to grant a new trial in order to prevent a miscarriage of justice. *Duncan v. Duncan,* 377 F.2d 49, 52 (6th Cir.), *cert. denied,* 389 U.S. 913 (1967). However, in reviewing a trial court's decision in this regard we must closely scrutinize the trial court's justifications in order to protect the litigant's right to a jury trial. *Id.* at 54. For as we discussed in *Duncan,*
>
> > Where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.
>
> *Id.* (quoting *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d. Cir.) (*en banc*), *cert. denied,* 364 U.S. 835 (1960)); *see also Hutchinson v. Stuckey,* 952 F.2d 1418, 1421 (D.C. Cir. 1992) (quoting *Vander Zee v. Karabatsos,* 589 F.2d 723, 729 (D.C. Cir. 1978)) (commenting that a trial court's decision to grant a new trial raises a "concern that a judge's nullification of the jury's verdict may encroach on the jury's important fact finding function"). Accordingly, this Circuit has determined that a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable. *See Duncan,* 377 F.2d at 52; *J.C. Wyckoff & Assocs. Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 (6th Cir. 1991) (holding

21

motion for new trial should be denied if the verdict could reasonably have been reached); *see also Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532, 538 (2d Cir. 1965), *cert. denied,* 382 U.S. 983 (1966) (reversing a district court order for a new trial and noting, "[o]nce the case went to the jury, its verdict should not have been upset, if reasonable men could find in defendant's favor, as they certainly could here.").

*Holmes v. City of Massillon, Ohio,* 78 F.3d 1041, 1047–48 (6th Cir. 1996) (parallel citations omitted).

Initially, it is an unchallenging endeavor to consider and conclude that Mr. Abbott's case is extraordinary considering the type of injuries, the severity of the injuries, the permanent lifelong effects of the injuries, the plaintiff's age at the time of the injuries, and his familial status at the time of the injuries. As Plaintiffs highlight, the jury heard testimony from Mr. Abbott, his parents, his wife, his doctors, and a renowned Urologic Oncologic Expert detailing his physical injuries, including:

- the complete removal of his cancerous testicle at the age of 16,

- a surgery requiring an incision from chest to groin, prolonged painful post-surgical recovery, ten years of cancer surveillance with multiple CT scans and x-rays—all increasing the risk for additional cancers caused by radiation,

- a second testicular cancer diagnosis 21 years after the first requiring surgical castration,

- loss of the ability to have biological children,

- a cancer metastasis in the abdominal lymph nodes requiring another surgery with an incision from chest to groin,

- more prolonged and painful post-surgery recovery,

- multiple hospitalizations for surgical adhesion-caused bowel obstructions, and

- weekly testosterone injections – with their own inherent side effects - for the rest of his life.

In addition to these physical injuries, the Jury heard and witnessed the emotional toll these injuries took first on a 16-year-old boy in high school and later on a married man with future plans of children. The Jury observed Travis' retelling of high school teasing, the chronic fear of cancer coming back, the grueling process of IVF for Julie, how all of this affected and affects their marriage, and how the loss of Travis ever being able to biologically father a child affects him. Finally, the

jury heard testimony of the effects of hormone replacement shots that Mr. Abbott must take for the remainder of his life, and the effects these hormones have on his emotional, mental, and psychological well-being. *See generally* Trial Testimony of Travis Abbott, Feb. 6, 2020 Trial Tr. (Vol. 12) [Abbott ECF No. 196] to Feb. 10, 2020 Trial Tr. (Vol. 10) [Abbott ECF No. 197].

(Pls.' Mem. in Opp. at 8–9, ECF No. 237).

DuPont challenges the jury's consideration of this evidence by offering additional evidence that the jury heard and from which, in DuPont's view, different inferences and conclusions could have been drawn, or that other conclusions are more reasonable for the jury to have made. For example, DuPont states that with regard to his first cancer, there is evidence that he recovered well mentally and physically:

Mr. Abbott testified about suffering from childhood testicular cancer and the accompanying loneliness and isolation—however, he later returned to basketball and high school where he was voted "most popular." Feb. 4, 2020 Trial Tr. (Vol. 10) [ECF No. 194] at 22:20-23:13; Feb. 10, 2020 Trial Tr. (Vol. 13) [ECF No. 197] at 104:19-22. He testified that learning, as a teenager, that his cancer had not metastasized was like "a ton of bricks off [his] shoulders." *Id.* at 23:12-21. Mr. Abbott attended college, two master's degree programs, and now serves as principal of Meigs High School. Feb. 4, 2020 Trial Tr. (Vol. 10) [ECF No. 194] at 25:8-12, 40:17-20, 45:9-16. Mr. and Mrs. Abbott were married in 2013 and have a strong marriage. Feb. 6, 2020 Trial Tr. (Vol. 12) [ECF No. 196] at 53:14-15; 59:14-21.

(Def.'s Mot. at 17, ECF No. 233.)

As to his second cancer, DuPont indicates that there was similar evidence of Mr. Abbott's survival, including that he "received world-class care at Indiana University" and while he "endured substantial pain and discomfort, but again made a full recovery," although he now had both of his testicles removed. *Id.* at 18 (citing Feb. 4, 2020 Trial Tr. (Vol. 10) [ECF No. 194] at 44:4-45:20).

Regarding Mr. Abbott's mental or emotional health, DuPont contends:

There was no evidence that Mr. Abbott has ever been diagnosed with, or taken prescription drugs for, anxiety or depression related to his testicular cancer. Nor was there any evidence that Mr. Abbott has ever seen a psychiatrist or a

23

psychologist. *Id.* at 98:2-9; Feb. 6, 2020 Trial Tr. (Vol. 12) [ECF No. 196] at 86:23-87:3. Mr. and Mrs. Abbott did not attempt to attend any counseling related to their fertility problems. Feb. 6, 2020 Trial Tr. (Vol. 12) [ECF No. 196] at 11-12 (Dec. 10, 2019 Depo of Dr. Will [ECF No. 214] at 81:7-82:3). The evidence showed that Mr. Abbott had normal and understandable levels of anxiety and worry related to his diagnoses and treatments. Feb. 5, 2020 Trial Tr. (Vol. 11) [ECF No. 195] at 94:9-16; *see also id.* at 12:20-21 (May 7, 2019 Depo. of Dr. Masterson [ECF No. 220] at 70:18-73:12).

*Id.*

And finally, as to Mr. Abbott's current life, DuPont offers that:

While [the Abbott's] testified about periods of marital hardship during his treatment, Mr. Abbott helped around the home, is an actively engaged father, they enjoy an active sex life, and have been blessed with [the successful adoption of] their daughter, who brings them great joy. Feb. 10, 2020 Trial Tr. (Vol. 13) [ECF No. 197] at 114:14-21. *Id.* at 114:4-116:12. Mr. Abbott has little or no further physical pain related to his cancer or treatment, and is very physically active. *Id.* at 116:13-119:10; *see also* D-Abbott 0266.1.

*Id.*

The law in this circuit, however, is clear that this Court "should deny a motion for a new trial 'if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable.'" *White v. Bell*, 656 F. App'x 745, 747 (6th Cir. 2016) (quoting *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991)). This is because, "[t]he trial court may not substitute its judgment or credibility determinations for those of the jury." *Farber*, 917 F.2d at 1391; *see also Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) ("in finding that a jury's verdict was against the weight of the evidence, the judge must, 'to some extent at least, substitute[ ] his judgment of the facts and the credibility of the witnesses for that of the jury.'"). Consequently, because there is competent, credible evidence upon which the jury's verdict could be based, this Court is not within its discretion to set the verdict aside.

### 3. Considerations of the Wealth of DuPont

DuPont next suggests that the size of the verdict shows how the jury was prejudiced against it.  Again, *Torres* is helpful.  In affirming a $42.4 million damages award, the *Torres* court explained that the "[s]ize [of the verdict], per se, will not suffice for proof of passion or prejudice."  *Torres*, 134 N.E.3d at 912 (citing *Pearson v. Cleveland Acceptance Corp.*, 17 Ohio App. 2d 239, 245 (Ohio App. 8th Dist. 1969) ("Passion or prejudice is a matter of proof, not assertion, and proof is not made from an empty record. Thus, the only probative support for the conclusion of 'passion or prejudice' is the size of the verdict.")).

Further, there is no evidence that the jury verdict here reflects improper consideration of the wealth of DuPont.  This Court bifurcated the punitive damages portion of this trial and provided only an interrogatory to the jury that asked if the jury found "that Mr. Abbott or Mrs. Abbott has proven by clear and convincing evidence that DuPont acted with actual malice and that Mr. Abbott or Mrs. Abbott has presented proof of actual damages that resulted from those acts or failures to act of DuPont? ('Actual malice' means a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.)"  (Jury Verdict, ECF No. 183.)  The jury answered that it did not find that the Abbotts had met this burden.  Thus, there was no trial held on punitive damages; hence no evidence presented on the wealth of DuPont.

### 4. Excessive Award Compared to Similar Cases or Similarly Situated Plaintiffs

DuPont contends that Mr. Abbott's jury award is "excessive and grossly disproportionate to awards in this MDL and in Ohio cases involving even more catastrophic injuries."  (Def.'s Mot. at 11, ECF No. 233.)   DuPont further asserts that the $40 million award to Mr. Abbott is so far above the 'guideposts' of comparable cases that it shocks the conscience." (Def.'s Mot at 14,

ECF No. 233; Def.'s Reply at 10, ECF No. 238) (citing Pls.' Mem. in Opp. at 16, ECF No. 237.) This Court disagrees.

### a. Ohio Cases

As cited *supra*, an Ohio court recently affirmed a jury awards of similar magnitude against challenges made under the same case and statutory law upon which DuPont relies here. In *Torres*, the court upheld a $42.4 million verdict that included a $26.4 million noneconomic damages award for a passenger in an auto accident who "suffered an open skull fracture with intracranial hemorrhaging and a frontal sinus fracture, . . . [which] necessitated several operations. She is blind in her right eye and has a diminished sense of taste and smell. . . . [and] suffers from cognitive and behavioral functioning limitations that affect her everyday." *Torres*, 134 N.E.3d at 926.

In *Torres*, the defendant on appeal "specifically argue[d] that the jury's award of noneconomic damages to [plaintiffs] 'dwarfs' national and Ohio noneconomic damages awards for such brain injuries." The court "disagree[d]," explaining:

> {¶47} We note, as the trial court did, the following recent Cuyahoga County verdicts: (1) $ 27,500,000 in compensatory damages in a mesothelioma case, (2) $ 23,018,790 in compensatory damages to a plaintiff, in his early forties, who was a passenger on a Greyhound bus and sustained a severed lower limb extremity, a severed urethra, and had a lower limb amputated, and (3) $ 19,000,000 in compensatory damages in a wrongful death suit of a 41-year-old construction worker struck and killed by a motorist in a construction zone.

> {¶48} This court's standard of review under R.C. 2315.19 is de novo. "De novo review encompasses an independent examination of the record and law without deference to the underlying decision." *Gateway Consultants Group, Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, at ¶ 22, citing *Demeraski v. Bailey*, 2015-Ohio-2162, 35 N.E.3d 913 (8th Dist.). In our independent review of these damages awards, we do not find that the verdicts were in excess of verdicts involving comparable injuries to similarly situated plaintiffs.

> {¶49} Therefore, the trial court did not err in denying appellants post-judgment motion pursuant to R.C. 2315.19.

*Id.* at 920.

In light of *Torres* and the cases it highlights, this Court does not find that the verdict was in excess of comparable injuries to similarly situated plaintiffs. Mr. Abbott's injuries were severe and life changing as set forth in detail above. And, the cases upon which DuPont relies in its briefing do nothing to change this conclusion. All of the cases are all materially distinguishable.

First, the medical malpractice cases consist of plaintiffs who sought medical treatment, as opposed to the circumstances of this case, where Mr. Abbott unknowingly drank contaminated water from his home. Mr. Abbott did not seek medical treatment or sign waivers regarding the danger attendant with certain procedures. *See e.g.*, *Fairrow v. OhioHealth Corp.*, No. 17-cv-1898, Jury Interrog. (Franklin Cty. C.C.P., Mar. 1, 2019) (improper catheter placement resulting in erectile dysfunction—$1.2 million). Nor was Mr. Abbott's cancer misdiagnosed by a medical professional. *See e.g., Robinson v. Am. Health Network*, No. 15-cv-006648, Jury Interrog. (Franklin Cty. C.C.P., Dec. 21, 2017); 2018 Jury Verdicts LEXIS 39018 (wrongful death for failure to order colonoscopy—$5.2 million); *Decker v. GE Healthcare*, No. 12-gd-50004, Judgment Entry [ECF No. 219] (N.D. Ohio Mar. 22, 2013) *aff'd* 770 F.3d 378 (6th Cir. 2014) (a patient with renal disease received MRI with gadolinium-based agents known to cause debilitating disease in renal impaired patients).

Instead, the jury found that DuPont's release of C-8 into Mr. Abbott's drinking water *caused* Mr. Abbott's cancers, and Mr. Abbott testified that if he had known that C-8 was in his water when DuPont knew it was in his water, he would have chosen not to drink it. In other words, unlike the patients in medical malpractice cases who had a choice about their treatment, Mr. Abbott was not given any choice, which was a focus of the evidence and argument presented

27

to the jury in his case.  And, while a misdiagnosis of a disease or improper treatment of a disease are tragic events, they are not the same as a defendant actually causing the plaintiff's disease, which is what the jury determined happened in Mr. Abbott's case.

Second, many of the cases involved plaintiffs with injuries that are less severe than Mr. Abbott's injuries. *See, e.g.*, *Cooley v. Lincoln Elec. Co.*, 776 F. Supp. 2d 511, 519 (N.D. Ohio 2011) (treatable impotency, depression, neurological memory problems); *Sunnycalb v. CSX Trans., Inc*., 926 F. Supp. 2d 988 & 2012 Jury Verdicts LEXIS 18675 (S.D. Ohio 2012) (permanent and painful reactive airway dysfunction syndrome in his respiratory system and chemical conjunctivitis in his eyes).

Third, DuPont relies on cases where the verdicts were found to be unsupported by the evidence.  For example, DuPont relies on *Jackson v. A-C Prod. Liab. Tr.*, 622 F. Supp. 2d 641, 650 (N.D. Ohio 2009), noting that the court "granted new trial under federal standards because $8 million award of non-economic damages for a mesothelioma-related death 'shocks the conscience' and is 'beyond the range of awards for similar injuries in similar cases.'"  (Def.'s Mot. at 15–16.)  Yet, the *Jackson* court found that the verdict shocked the conscience because it "was based on inadequate inferences of asbestos exposure; improper expert hypotheticals and testimony; and an excessive verdict which was not within the range of proof" that was "neither reasonable nor supported by the weight of the evidence."  *Jackson*, 622 F. Supp. 2d at 650.  In the instant action, this Court finds no such thing; indeed, the opposite.  That is, there was no improper expert testimony, inadequate inferences of exposure, and the verdict was within the range of proof and was supported by the weight of the evidence (as discussed more *supra*).

b.    **C-8 Personal Injury MDL**

DuPont argues that Mr. Abbott's award is unreasonable because it is not comparable to the jury awards to the other MDL plaintiffs.  The Court finds these comparisons too are readily distinguishable for several reasons.  To begin with, the first two verdicts were in bellwether trials.  Bellwether plaintiffs are purposely selected to exclude the most severely injured plaintiffs because it would frustrate the bellwether procedure's purpose.  That is, the need to try multiple bellwether cases to facilitate settlement of all cases is an important component of the handling an MDL.  *See The Manual for Complex Litigation*, § 22.315 (bellwether trials are meant to "produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims . . . and what range of values the cases may have"); Alexandra D. Lahav, *Bellwether Trials*, at 577–78, The George Washington Law Review (2008) ("Judges currently use bellwether trials informally in mass tort litigation to assist in valuing cases and to encourage settlement."); *In re E. I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, CV 2:13-MD-2433, 2019 WL 6310731, at *26 (S.D. Ohio Nov. 25, 2019).

It was not until the third and fourth trials that non-bellwether plaintiffs presented their cases.  The third trial ended with a verdict in favor of Mr. Vigneron totaling $12.5 million ($2 million in compensatory and $10.5 million punitive), and the parties settled the fourth case before it was given to the jury for an undisclosed amount.

While the third trial's plaintiff, Mr. Vigneron, received a total award significantly less than Mr. Abbott's, his injuries too were significantly less than Mr. Abbott's.  While Mr. Vigneron did suffer from testicular cancer and was ultimately subjected to three painful rounds of chemotherapy, his permanent damage was peripheral neuropathy and the loss of one testicle.

Mr. Vigneron did not go through an open abdominal retroperitoneal lymph node dissection surgery in which three lymph nodes were positive for testicular cancer, as did Mr. Abbott— twice.  Mr. Vigneron was not diagnosed with metastatic testicular cancer and therefore did not even undergo this surgery once, let alone twice.  Mr. Vigneron was not subjected to multiple hospitalizations related to post-surgical internal scar tissue, multiple bowel obstructions, and contractible hiccups, as was Mr. Abbott.

Notably, Mr. Vigneron had only one cancer; only one oriechtomy.  Thus, he was not rendered sterile from his cancer.  He was also much older than Mr. Abbott and had already fathered and raised his children.  Consequently, Mr. Vigneron did not even contemplate the impact a subsequent infertility may cause him and his wife.  The Abbotts, however, saw multiple fertility specialists, harvested sperm, and underwent an IVF treatment process all in hopes of conceiving a biological child but were ultimately unsuccessful despite Mr. Abbott's sperm successfully fertilizing Mrs. Abbott's eggs.

Finally, Mr. Vigneron retained the ability to produce the necessary hormones for the remainder of his life, while Mr. Abbott cannot.  Mr. Abbott must instead undergo lifelong testosterone replacement therapy via weekly injections.  He testified to the emotional toll and unpredictable physical impact these replacement hormones cause him.

The second non-bellwether plaintiff was Mr. Moody, the first testicular cancer case where the plaintiff was rendered sterile.  However, he was rendered sterile from the treatment of his cancer, not from the loss of both testicles.  Further, he too was much older than Mr. Abbott and had already fathered and raised his children.  He also only had one cancer and the loss of one testicle.  Consequently, he retained the ability to produce the hormones necessary for his health for the remainder of his life.  Thus, while not nearly as severe injuries were suffered by Mr.

Moody, it was likely the closest case for comparison. The parties settled this case before the jury could render a verdict.

Based on the foregoing, the Court finds that the cases set forth above are relevant guideposts as to why Mr. Abbott's jury award was much higher than the other MDL plaintiffs and those Ohio cases presented by the parties, and more in line with the cases set forth by *Torres*. The material differences between Mr. Abbott and the plaintiffs in those cases is supported by competent and credible evidence that was produced at trial.

### 5. Conclusion - Remittitur

After reviewing the factors set forth in Ohio case law, Ohio Revised Code § 2315.19, and the law developed under Federal Rule of Civil Procedure 59, the Court finds that the jury's award to Mr. Abbott does not constitute "a seriously erroneous result" that "is beyond the maximum damages that the jury reasonably could find to be compensatory for [Mr. Abbott's] loss." *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d at 475. When viewing all of the evidence in the light most favorable to Mr. Abbott, the Court cannot remit the jury award because it is not convinced that "the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Id.* Nor was the award "against the manifest weight of the evidence." *Matus*, 707 F. App'x at 314. Mr. Abbott's injuries were fully supported by the evidence presented at trial, and the jury's award was a fair, reasonable attempt to compensate Mr. Abbott for those injuries.

### IV.

For the reasons set forth above, the Court **GRANTS IN PART, DENIES IN PART, AND FINDS MOOT IN PART** Defendant's Motion. (ECF No. 233.) Specifically, the Court:

- **GRANTS** Defendant's request to apply the Ohio Tort Reform Act to the damages awarded to Mrs. Abbott, thereby lowering the award from $10,000,000 to $250,000,

which **MOOTS** Defendant's request for remittitur of the damages awarded to Mrs. Abbott; and

- **DENIES** Defendant's request for remittitur of the damages awarded to Mr. Abbott.

Because this is the last post-trial motion before the Court, the Clerk is **DIRECTED** to **ENTER JUDGMENT** in this case in accordance with the jury verdict and this Opinion and Order.  That is, to **ENTER JUDGMENT** in favor of Mr. and Mrs. Abbott, awarding Mrs. Abbott $250,000 and Mr. Abbott $40,000,000.

     **IT IS SO OREDERED.**


**3/29/2021**                                   **s/Edmund A. Sargus, Jr.**
**DATE**                                         **EDMUND A. SARGUS, JR.**
                                                 **UNITED STATES DISTRICT JUDGE**