# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  December 05, 2022

Mr. Mark Alan Behrens
Shook, Hardy & Bacon
1800 K Street, N.W.
Suite 1000
Washington, DC 20006

Ms. Alison Elisabeth Borochoff-Porte
Pollock Cohen
111 Broadway
Suite 1804
New York, NY 10006

Mr. John A. Burlingame
Squire Patton Boggs
2550 M Street, N.W.
Suite 1900
Washington, DC 20037

Ms. Elizabeth E. Chambers
Mr. Jon Collins Conlin
Cory Watson
2131 Magnolia Avenue, S.
Suite 200
Birmingham, AL 35205

Mr. Gary A. Davis
21 Battery Park Avenue, Suite 206
Ashville, NC 28801

Mr. Christopher P. Gordon
Bricker & Eckler
100 S. Third Street
Columbus, OH 43215

Ms. Lauren Suzanne Kuley
Squire Patton Boggs
201 E. Fourth Street
Suite 1900
Cincinnati, OH 45202

Ms. Aneca E. Lasley
Ice Miller
250 West Street
Suite 700
Columbus, OH 43215

Mr. Damond R. Mace
Squire Patton Boggs
127 Public Square
Suite 1000
Cleveland, OH 44114

Mr. Colter Lawrence Paulson
Squire Patton Boggs
201 E. Fourth Street
Suite 1900
Cincinnati, OH 45202

Mr. Brian David Schmalzbach
McGuireWoods
800 E. Canal Street
Richmond, VA 23219

Ms. Anne M. Sferra
Bricker & Eckler
Education
100 S. Third Street
Columbus, OH 43215

Mr. Frank Jerome Tapley
Cory Watson
2131 Magnolia Avenue, S.
Suite 200
Birmingham, AL 35205

Mr. Mitchell Theodore
Cory Watson
2131 Magnolia Avenue, S., Suite 200
Birmingham, AL 35205

Mr. Brett Cooper Thompson
Cory Watson
2131 Magnolia Avenue, S.
Suite 200
Birmingham, AL 35205

Mr. Sean Peter Wajert
Shook, Hardy & Bacon
2001 Market Street
Suite 3000
Philadelphia, PA 19103

Mr. Matthew Wessler
Gupta Wessler
2001 K Street, N.W.
Suite 850, N.
Washington, DC 20006

Mr. Jeffrey Robert White
Center for Constitutional Litigation
777 Sixth Street, N.W.
Suite 250
Washington, DC 20001

> Re:  Case No. 21-3418, *In re: Travis Abbott, et al v. E. I. du Pont de Nemours & Co*
> Originating Case No. : 2:13-md-02433 : 2:17-cv-00998

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

> Yours very truly,
>
> Deborah S. Hunt, Clerk
>
>
> Cathryn Lovely
> Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

In re:  E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation.

───────────────────────────────

Travis Abbott; Julie Abbott,

*Plaintiffs-Appellees,*

*v.*

E. I. du Pont de Nemours and Company,

*Defendant-Appellant.*

⎤
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎥ >  No. 21-3418
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎦

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
Nos. 2:13-md-02433; 2:17-cv-00998—Edmund A. Sargus, Jr., District Judge.

Argued:  June 10, 2022

Decided and Filed:  December 5, 2022

Before:  BATCHELDER, STRANCH, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Damond R. Mace, SQUIRE PATTON BOGGS (US) LLP, Cleveland, Ohio, for Appellant.  Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellees.  **ON BRIEF:**  Damond R. Mace, Aneca E. Lasley, SQUIRE PATTON BOGGS (US) LLP, Cleveland, Ohio, Lauren S. Kuley, Colter L. Paulson, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, John A. Burlingame, SQUIRE PATTON BOGGS (US) LLP, Washington, D.C., for Appellant.  Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., Rachel Bloomekatz, BLOOMEKATZ LAW LLC, Columbus, Ohio, Jon C. Conlin, F. Jerome Tapley, Elizabeth E. Chambers, Nina Towle Herring, Mitchell Theodore, Brett Thompson, CORY WATSON, PC, Birmingham, Alabama, for Appellees.  Brian D. Schmalzbach, McGUIRE WOODS LLP, Richmond, Virginia, Mark A. Behrens, SHOOK, HARDY & BACON, L.L.P. Washington, D.C., Sean P. Wajert, SHOOK, HARDY & BACON, L.L.P., Philadelphia, Pennsylvania, Anne Marie Sferra, Christopher P. Gordon, BRICKER &

No. 21-3418          *In re E. I. du Pont de Nemours & Co.*          Page 2

ECKLER LLP, Columbus, Ohio, Jeffrey R. White, AMERICAN ASSOCIATION FOR JUSTICE, Washington, D.C., Alison Borochoff-Porte, POLLOCK COHEN LLP, New York, New York, Gary A. Davis, DAVIS & WHITLOCK, P.C., Asheville, North Carolina, for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which DONALD, J., joined in full, and BATCHELDER, J., joined in part.  BATCHELDER, J. (pp. 30–46), delivered a separate opinion concurring in part and dissenting in part.

—————————————

**OPINION**

—————————————

JANE B. STRANCH, Circuit Judge.  In the 1950s, E. I. du Pont de Nemours & Co. (DuPont) began discharging vast quantities of C-8—a "forever" chemical that accumulates in the human body and the environment—into the Ohio River, landfills, and the air surrounding its plant in West Virginia, contaminating the communities' water sources.  By the 1960s, DuPont learned that C-8 is toxic to animals and, by the 1980s, that it is potentially a human carcinogen. Despite these and other warnings, DuPont's discharges increased between 1984 and 2000. By the early 2000s, evidence confirmed that C-8 caused several diseases among the members of the communities drinking the contaminated water, which led to a class action lawsuit against DuPont.  The parties undertook negotiations and ultimately entered into a unique settlement agreement in which DuPont promised to carry out treatment of the affected water and to fund a scientific process that would inform the class members and communities about the dangers of and harms from C-8 exposure.  In service of that process, the class voted to make receipt of the cash award contingent on a full medical examination to test for and collect data on C-8 exposure. A panel of scientists then conducted an approximately seven-year epidemiological study of the blood samples and medical records of over 69,000 affected community members, during which litigation against DuPont was paused.  The parties' agreement limited the legal claims that could be brought against DuPont based on the study's determination of which diseases prevalent in the communities were likely linked to C-8 exposure.  The resulting cases were consolidated in a multidistrict litigation (MDL).

After two bellwether trials and a post-bellwether trial reached jury verdicts against DuPont, the parties settled the remaining cases.  That did not end all the C-8 litigation, as more class members filed suit when they became sick or discovered the connection between their diseases and C-8, including this case brought by Travis and Julie Abbott.  At the Abbotts' trial, the district court applied collateral estoppel to specific issues that were unanimously resolved in the three prior jury trials, excluded certain evidence from the trial based on the initial settlement agreement, and rejected DuPont's motion for a directed verdict on its statute-of-limitations defense.  The jury found for the Abbotts.  On appeal, DuPont challenges those three district court decisions.  For the reasons that follow, we **AFFIRM** the judgment of the district court in full.

## I.  BACKGROUND

The Abbotts' case has its roots in the 1950s, when DuPont began using C-8 to manufacture Teflon© products at its Washington Works Plant in Parkersburg, West Virginia.  C-8, or perfluorooctanoic acid (PFOA), is a synthetic organic chemical that is soluble in water and persists in both the human body and the environment.  DuPont discharged C-8 into the air, the Ohio River, and landfills without limits until the early 2000s, as explained below.

DuPont learned in the 1960s that C-8 was toxic to animals and was reaching groundwater in the communities surrounding its plant.  By the late 1980s, DuPont internally considered the chemical a possible human carcinogen and found that it stayed in the human bloodstream for years.  Despite warnings from its C-8 supplier on proper disposal and the availability of a substitute, DuPont increased its C-8 discharges between 1984 and 2000.  Documents obtained in discovery in a 1998 case against DuPont revealed the contamination and kicked off a wave of further litigation.

### A.  The *Leach* Class Action and Settlement

In the early 2000s, individuals who had consumed the contaminated water sued DuPont in West Virginia state court in *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (W. Va. Cir. Ct.).  They brought numerous claims under West Virginia common law, seeking equitable, injunctive, and declaratory relief, and punitive and compensatory damages for alleged injuries arising from C-8 exposure.  In 2002, the West Virginia trial court certified a class of nearly

80,000 individuals "whose drinking water is or has been contaminated with" C-8 attributable to DuPont's C-8 discharges from the Washington Works Plant. (MDL R. 820-8, *Leach* Agreement, PageID 11807)[1]  In 2005, the trial court approved the parties' class-wide settlement agreement, called the *Leach* Agreement in the later MDL proceedings. (*See generally id.*)

The *Leach* Agreement fashioned unique measures to be undertaken over time to obtain scientific and medical information in order to address the harms to the affected workers and communities. For example, the parties agreed that DuPont would fund the design, installation, operation, and maintenance of a water treatment project designed to "reduce the levels of C-8 in the affected water supply to the lowest practicable levels as specified by the individual Public Water Districts." (*Id.*, PageID 11821)  The *Leach* Plaintiffs were also concerned about how the members of the class were and would be harmed by C-8, so the class voted to make class members' receipt of the cash award reached in the settlement contingent on a full medical examination.[2]  The medical data that resulted from those examinations were used in a broad epidemiological study into the effects of C-8 on the community, which DuPont was required to fund. (*See* MDL R. 2416-3, PageID 35731–32; MDL R. 820-8, PageID 11823)  The community health study was performed by the Science Panel, three independent epidemiologists jointly selected by DuPont and the Plaintiffs, that carried out research on diseases among the communities exposed to C-8 in the water districts around Washington Works. (MDL R. 820-8, PageID 11823)  The *Leach* Agreement also led to medical monitoring of diseases the Science Panel deemed linked to C-8 for class members. (*Id.*, PageID 11826–27)

The parties also agreed to a unique procedure that defined the parameters of legal actions the *Leach* Plaintiffs could bring against DuPont based on the results of the epidemiological

---

[1] The record contains documents filed in Abbott's individual case, 2:17-cv-998 on the district court docket, documents filed on the MDL docket, 2:13-md-2433, as well as documents filed in earlier individual cases against DuPont. Where relevant, our opinion refers to documents filed on Abbott's docket as "R." and documents found on the MDL docket as "MDL R." Where documents from earlier individual cases are relevant, the case name is included before the "R." (*e.g.*, "Bartlett R." for documents from the *Bartlett* docket).

[2] *See* Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, N.Y. Times (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html. A *Leach* "Plaintiff" or "class member" is defined as those individuals who had consumed drinking water with 0.05 parts per billion (ppb) or more "C-8 attributable to releases from Washington Works" from at least one of six specific public water districts, private wells in those districts, or otherwise specified private wells. (MDL R. 820-8, PageID 11807)

study. For each disease studied, the Science Panel would ultimately issue either a "Probable Link finding" or a "No Probable Link finding." A "Probable Link" means, "based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." (*Id.*, PageID 11805) Once the Science Panel released its results, the right of individual class members to pursue their personal injury and wrongful death claims against DuPont was limited to diseases with a Probable Link finding. (*Id.*, PageID 11811) In these lawsuits related to linked diseases, DuPont agreed not to contest general causation—"that it is probable that exposure to C-8 is capable of causing a particular Human Disease"—but it retained the right to contest specific causation and assert any other defenses not barred by the *Leach* Agreement. (*Id.*, PageID 11804, 11811) The Agreement defined specific causation to mean "that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual." (*Id.*, PageID 11806) For diseases for which the Science Panel reported a "No Probable Link finding" or found no association with C-8 exposure, class members would be forever barred from bringing claims for injury or death against DuPont for C-8 exposure based on those diseases. (*Id.*, PageID 11810) The *Leach* Plaintiffs also agreed to refrain from seeking immediate relief—through a conditional release of claims and a covenant not to sue DuPont for C-8 exposure—until the Science Panel completed its study. (*See id.*, PageID 11810–11)

For seven years, the Science Panel engaged in the specified epidemiological study. In one of the largest domestic epidemiological studies ever, over 69,000 class members provided blood samples and medical records. (MDL R. 4306, Disp. Mot. Order No. 12 Denying JMOL on *Bartlett* Claims, PageID 89502) In 2012, using this data and its own established protocols, the Science Panel reported Probable Link findings as defined in the *Leach* Agreement for six diseases: kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol, and pregnancy-induced hypertension and preeclampsia. (MDL R. 5285, Disp. Mot. Order on Issue Preclusion, PageID 128535) The Science Panel reached a No Probable Link Finding for approximately 50 diseases; class members with those diseases were forever barred from bringing claims against DuPont based on those diseases, even if later discovered facts and science revealed a link to C-8. (*Id.*; MDL R. 820-8, PageID 11810)

### B. The MDL and Prior Appeal

After the Science Panel's Probable Link findings, the members of the *Leach* class with linked diseases brought approximately 3,500 cases against DuPont pursuant to the *Leach* Agreement. At DuPont's request, the federal courts consolidated those cases in an MDL in the Southern District of Ohio. The district court overseeing the MDL engaged in a months-long process with the parties to identify 20 cases for discovery, then to narrow that list further for bellwether trials. In guiding the parties' selections, both "[t]he parties and the Court intend[ed]" that the bellwether plaintiffs selected for initial discovery and ultimately trial "reflect a representative sampling of cases which [would] provide meaningful information for the broader population of cases."[3] Toward this end, the parties limited their initial plaintiff designations according to specified parameters, and the court established a detailed procedure for selection of the initial bellwether trials. The parties were ordered to exchange lists of four proposed plaintiffs, then each side was permitted to strike one of the other side's selections. Ultimately, the parties proposed and the court accepted six cases—three selected by the Plaintiffs' Steering Committee, three by DuPont—for bellwether trials. The district court overseeing the MDL also oversaw the cases as they went to trial or settled.

In the first bellwether trial—a case selected by DuPont—the jury awarded Carla Bartlett $1.6 million in compensatory damages against DuPont for her state law tort claims related to kidney cancer. *See Bartlett v. DuPont*, No. 13-cv-170. Five bellwether cases remained. The next trial, *Freeman v. Dupont*, No. 13-cv-1103, a case selected by Plaintiffs, included a negligence claim arising from Freeman's testicular cancer and resulted in a jury verdict for Freeman. DuPont settled the remaining bellwether cases with the Plaintiffs. The Plaintiffs' Steering Committee then selected the first of the non-bellwether cases to go to trial in 2016. *Vigneron v. DuPont*, No. 13-cv-136. That case brought negligence claims, used the jury instructions on negligence given at the *Bartlett* and *Freeman* trials, and resulted in a jury verdict awarding $2 million in compensatory damages to the plaintiff.

---

[3]The court's and parties' intentions were aligned with the broader purpose of bellwether trials, which serve the "twin goals" of being "informative indicators of future trends and catalysts for an ultimate resolution." Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2343 (2008).

While DuPont continued litigation in the district court, it appealed the *Bartlett* case.  In that appeal, DuPont argued that the district court had interpreted the *Leach* Agreement in a way that made the *Bartlett* trial and all other MDL cases fundamentally unfair.  The district court had determined that the bargain struck by the parties as set out in the language and defined terms in the *Leach* Agreement barred any challenges to general causation.  DuPont claimed that decision was "[a] threshold contract interpretation error [that] eliminated the heart of a critical defense for DuPont in each of the 3,500 cases" in the MDL and resulted in incorrect evidentiary rulings. (MDL R. 5285, PageID 128547 (quoting *Bartlett v. DuPont*, No. 16-3310 (6th Cir.), DuPont Appellant Br. at 1, 18))

In February 2017, after oral argument but before we issued a decision in *Bartlett*, DuPont announced a settlement with the remaining MDL cases, including *Bartlett*, and withdrew that appeal.  Although it halted further proceedings in *Bartlett*, the global settlement did not entirely end the litigation.  As the vast majority of the MDL cases wound down, some additional Plaintiffs covered by the *Leach* Agreement, including Travis and Julie Abbott, filed cases.

### C.  The Abbott Case

Travis Abbott has lived and worked in and around Pomeroy, Ohio, since childhood. Consequently, for 20 years—beginning at only 6 years old—Abbott was exposed to C-8 contaminated water at home and in his community.  At age 16, Abbott found a mass in his left testicle, and, after surgically removing his testicle, doctors diagnosed him with testicular cancer. He did not experience a relapse until 10 years later when he was beginning to plan a family with his wife, Julie, while still living in the Pomeroy region.  In October 2015, Abbott sought medical help for pain in his remaining testicle.  A definitive diagnosis of testicular cancer came only after doctors removed his testicle to conduct a pathology analysis.  The spread of the cancer to his lymph nodes required further surgery, and Abbott must take testosterone injections due to his loss of both testicles.

Travis and Julie Abbott sued DuPont in November 2017.  The district court scheduled the Abbotts' case for a joint trial with that of another couple, the Swartzes, in early 2020.  After rejecting DuPont's renewed challenges to the district court's MDL rulings on the meaning of the

*Leach* Agreement, the district court granted partial summary judgment to the Abbotts on the duty, breach, and foreseeability elements of Travis Abbott's negligence claims based on collateral estoppel. The court further held that collateral estoppel precluded DuPont from relitigating (1) the interpretation of the *Leach* Agreement and its application to evidentiary issues and (2) the inapplicability of the Ohio Tort Reform Act (OTRA) to Travis Abbott's claims.

The month-long jury trial for the Abbott and Swartz cases began in January 2020. In evidentiary rulings, the district court prohibited DuPont from offering evidence and testimony that the court concluded would violate the *Leach* Agreement, including testimony asserting that Travis Abbott's level of C-8 exposure was insufficient to cause his cancers. The court instructed jurors that 0.05 ppb was a threshold level for general causation, but that specific causation was still at issue in the case. DuPont then presented testimony about the concentration of C-8 in Abbott's bloodstream and C-8's half-life in the human body, along with expert opinions on potential alternative causes of his cancers. The jury found for both Travis and Julie Abbott, awarding them $40 million and $10 million in damages, respectively. The district court later applied the Ohio Tort Reform Act to Julie Abbott's award, reducing it to $250,000. Because the jury did not agree on the Swartzes' claims related to Mrs. Swartz's kidney cancer, that case concluded in a mistrial.

This appeal in the Abbotts' case followed.

## II. ANALYSIS

DuPont raises several challenges to the district court's decisions on appeal. First, it challenges the order granting the MDL Plaintiffs' motion for application of nonmutual offensive collateral estoppel to duty, breach, general causation, and the inapplicability of the OTRA. Based on that order, those issues were not submitted to the jury for its deliberations in the Abbotts' case. Next, DuPont argues that several of the district court's evidentiary rulings related to specific causation were erroneous. And finally, DuPont asserts that the district court abused its discretion by entering a directed verdict denying DuPont's statute of limitation defense. We address each challenge in turn.

No. 21-3418                *In re E. I. du Pont de Nemours & Co.*                Page 9

### A. Nonmutual Offensive Collateral Estoppel

A district court has "broad discretion to determine" whether to apply collateral estoppel. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). We review de novo whether the district court's decision to do so was error. *Abbott v. Michigan*, 474 F.3d 324, 331 (6th Cir. 2007).

In successive federal diversity actions, we apply state law to determine whether a prior decision has preclusive effect, so long as the state rule is not "incompatible with federal interests." *Prod. Sols. Int'l, Inc. v. Aldez Containers, LLC*, 46 F.4th 454, 457–58 (6th Cir. 2022) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508-09 (2001)).

Ohio courts generally apply issue preclusion when that issue "was actually and directly litigated in the prior action" and "a court of competent jurisdiction" decided the issue, and "the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action." *State ex rel. Jefferson v. Russo*, 150 N.E.3d 873, 875 (Ohio 2020) (quoting *Thompson v. Wing*, 637 N.E.2d 917, 923 (Ohio 1994)). The "fact or . . . point" in question must have been "actually and necessarily litigated and determined" as part of a final judgment. *Fort Frye Tchrs. Ass'n, OEA/NEA v. State Emp. Rels. Bd.*, 692 N.E.2d 140, 144 (Ohio 1998); *see State v. Williams*, 667 N.E.2d 932, 935 (Ohio 1996). And the party against whom estoppel is sought must have had a "full and fair opportunity" to litigate the issue in the previous action. *Walden v. State*, 547 N.E.2d 962, 966 (Ohio 1989) (quoting *Hicks v. De La Cruz*, 369 N.E.2d 776, 778 (Ohio 1977)). In sum, Ohio's standard is very similar to the federal one. *See Smith v. S.E.C.*, 129 F.3d 356, 362 (6th Cir. 1997) (en banc).

DuPont initially claimed that Ohio law forbids the use of non-mutual offensive collateral estoppel altogether. While the "principle of mutuality" is generally a "prerequisite to the application of collateral estoppel," the Ohio Supreme Court has explicitly "recogniz[ed] the need in certain instances for the flexibility and exceptions to such rule." *Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 987 (Ohio 1983). Where a "party defendant clearly had his day in court on the specific issue brought into litigation within the later proceeding, the non-party plaintiff [can] rely upon the doctrine of collateral estoppel to preclude the relitigation of that

specific issue." *Id.* at 985. Ohio is "willing to relax the [mutuality] rule where justice would reasonably require it."[4] *Id.* at 984.

If Ohio's requirements are met, the Supreme Court has offered four additional considerations that may suggest caution in determining whether to apply offensive nonmutual collateral estoppel against a party. *Parklane Hosiery Co.*, 439 U.S. at 329–31; *see Goodson*, 443 N.E.2d at 983 & n.12 (discussing *Parklane Hosiery* factors); *O'Nesti v. DeBartolo Realty Corp.*, 862 N.E.2d 803, 809 (Ohio 2007) (same). First, courts should avoid applying nonmutual offensive collateral estoppel where it would encourage "a 'wait and see' attitude" among potential plaintiffs hoping "that the first action by another plaintiff will result in a favorable judgment." *Parklane Hosiery Co.*, 439 U.S. at 330. Second, courts should not use the doctrine if the defendant did not have a reason "to defend vigorously, particularly if future suits [were] not foreseeable." *Id.* Third, the doctrine should not apply "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Id.* Fourth and finally, courts should avoid the use of nonmutual offensive collateral estoppel if the later action would give "the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 331.

### 1. Application of Collateral Estoppel to the Negligence Claims

As an initial matter, we address DuPont's claim that our court has placed additional constraints on the use of nonmutual offensive collateral estoppel in mass tort cases. DuPont points to a footnote in *In re Bendectin Products Liability Litigation*, 749 F.2d 300 (6th Cir. 1984), in which we noted that the Supreme Court's decision in *Parklane Hosiery* "explicitly stated that offensive collateral estoppel could not be used in mass tort litigation." *Id.* at 305 n.11. DuPont's interpretation of *Bendectin*, however, is inconsistent with the Supreme Court's clear

---

[4]Even if mutuality were required, it is a "somewhat amorphous" concept under Ohio law. *Brown v. Dayton*, 730 N.E.2d 958, 962 (Ohio 2000). A contractual relationship is not required; a "mutuality of interest, including an identity of desired result," may be sufficient. *Id.* "As a general matter, privity 'is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata.'" *Id.* (quoting *Thompson v. Wing*, 637 N.E.2d 917, 923 (Ohio 1994)). Not only do Plaintiffs share a contractual relationship with DuPont—the *Leach* Agreement—but they also share a mutuality of interest and identity of desired result with all other plaintiffs in this MDL, who, like Abbott, are *Leach* class members, allege injury due to drinking water contaminated with C-8, and seek the same result.

pronouncement in *Parklane Hosiery* that "the preferable approach for dealing with" the fairness concerns regarding offensive collateral estoppel "is not to preclude the use of offensive estoppel" but instead to provide "broad discretion" to trial courts determining when it applies. *Parklane Hosiery Co.*, 439 U.S. at 331; *see also City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1165 (6th Cir. 1984). *Bendectin*, an appeal of a district court's class-certification decision, focused on the requirements of Rule 23, and our opinion mentioned but did not hinge on whether district courts could ever apply nonmutual offensive collateral estoppel in mass tort cases. *Bendectin*, 749 F.2d at 304–05. No court has followed the *Bendectin* footnote beyond agreeing that courts should not use offensive collateral estoppel in mass tort cases in ways inconsistent with the *Parklane Hosiery* factors. *See, e.g.*, *In re Air Crash at Detroit Metro. Airport, Detroit, Mich. on Aug. 16, 1987*, 776 F. Supp. 316, 324–25 (E.D. Mich. 1991) (explaining that nonmutual offensive collateral estoppel could be used in mass tort cases if consistent with the instruction in *Parklane Hosiery* and "should be developed on a case-by-case basis"). Ohio has similarly instructed that offensive collateral estoppel is permissible in the mass tort context where the *Parklane Hosiery* standards are applied.[5] *See Goodson*, 443 N.E.2d at 987.

Ohio's collateral estoppel factors and the additional considerations delineated in *Parklane Hosiery* provide the framework for the district court's exercise of its broad discretion. We will not place DuPont's requested additional constraints on that discretion given the Supreme Court's clear instruction.

In applying offensive collateral estoppel, the district court concluded that the three prior jury trials—*Bartlett*, *Freeman*, and *Vigneron*—raised and litigated to a final conclusion the same questions of duty, breach, and foreseeability raised in Travis Abbott's negligence claims. DuPont asserts that this use of nonmutual offensive collateral estoppel violated its due process rights because duty, breach, and foreseeability in the three prior trials were factually distinct.

---

[5]DuPont frames *Goodson* as demonstrating the Ohio Supreme Court's disapproval of mass-tort collateral estoppel. But the language DuPont quotes from *Goodson* that expresses caution about applying "a decision made by one jury in the context of one set of facts" to "all subsequent cases involving separate underlying factual circumstances" is specific to product liability litigation; it is not about mass-tort litigation generally. 443 N.E.2d at 987.

No. 21-3418          *In re E. I. du Pont de Nemours & Co.*          Page 12

The Abbotts dispute that factual argument and counter that the use of collateral estoppel here "serve[d] the core principles of judicial integrity and economy," and the doctrine "was made for a case like this one." We apply Ohio law and *Parklane Hosiery*'s considerations in turn.

### a. Ohio Law

We begin by determining whether the "identical issue was actually decided in the former case." *Goodson*, 443 N.E.2d at 987. Factual differences do exist among the different cases, but the question is whether any of those factual differences are legally significant—*i.e.*, were crucial to resolving the issues in the compared cases. *See Smith v. Sushka*, 117 F.3d 965, 969–70 (6th Cir. 1997) (quoting *Monahan v. Eagle Picher Indus., Inc.*, 486 N.E.2d 1165, 1168 (Ohio 1984)); *see also United States v. Stauffer Chem. Co.*, 464 U.S. 165, 172 (1984). DuPont claims that duty, breach, and foreseeability were unique to each plaintiff given that each plaintiff was differently situated. For example, it asserts, the *Freeman* and *Vigneron* Plaintiffs argued that DuPont should have foreseen their injuries because the C-8 concentration in their water districts' drinking water exceeded DuPont's voluntary exposure guidelines. Travis Abbott's water was below these guidelines at relevant times. DuPont also contends that Abbott conceded that DuPont was unaware of C-8 in his water supply before 2001, unlike the Plaintiffs in *Freeman* and *Vigneron* who asserted that DuPont knew about, but did not warn them of, the C-8 in their drinking water for over a decade. DuPont argues that these questions of duty, breach, and foreseeability were so closely tied to the individual plaintiffs that preclusive effect is impossible.

DuPont's argument attempts to ignore the fundamental principle that the pertinent factual issues for the negligence claims in each trial revolved around *DuPont's* conduct and knowledge in relation to the *Leach* class members. In *Bartlett*, *Freeman*, and *Vigneron*—the cases that served as the basis for collateral estoppel—each jury received identical instructions on duty, breach, and foreseeability. Each jury found that DuPont owed a duty to the class member, breached that duty, and should have foreseen that injury would result from the alleged breach. To illustrate, consider the jury instructions from the *Bartlett* case:

### NEGLIGENCE – DUTY

To prove the existence of a duty, Mrs. Bartlett must show by a preponderance of the evidence that a reasonably prudent person would have foreseen that injury was likely to result to someone in Mrs. Bartlett's position from DuPont's conduct. In deciding whether reasonable prudence was used, you will consider whether DuPont should have foreseen, under the circumstances, that the likely result of an act or failure to act would cause injuries. The test for foreseeability is not whether DuPont should have foreseen the injuries exactly as it happened to Mrs. Bartlett. The test is whether under the circumstances a reasonably prudent corporation would have anticipated that an act or failure to act would likely cause injuries.

### NEGLIGENCE – BREACH

If you find that DuPont owed Mrs. Bartlett a duty, you must next determine whether DuPont breached that duty. A corporation breaches a duty by failing to use ordinary care. As I have just instructed, ordinary care is the care that a reasonably careful corporation would use under the same or similar circumstances.

If you decide that DuPont did not use ordinary care, then DuPont breached its duty of care to Mrs. Bartlett. If you decide that DuPont did use ordinary care, then DuPont did not breach its duty of care to Mrs. Bartlett. . . .

### NEGLIGENCE – PROXIMATE CAUSE – FORSEEABLE INJURY

. . . . For Mrs. Bartlett's injuries to be considered the natural and probable consequence of an act, Mrs. Bartlett must prove that DuPont should have foreseen or reasonably anticipated that injury would result from the alleged negligent act. The test for foreseeability is not whether DuPont should have foreseen the injury exactly as it happened to Mrs. Bartlett. Instead, the test is whether under the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely result in or cause injuries.

(*Bartlett* R. 139, *Bartlett* Final Jury Instructions, PageID 6205–08)

The instructions must and do reference each specific plaintiff, but their focus, and the focus of the jury's inquiry in each of the cases, was on DuPont's conduct. The instructions state that a duty exists when "a reasonably prudent person would have foreseen that injury was likely to result to *someone in Mrs. Bartlett's position* from DuPont's conduct," explaining that "[t]he test for foreseeability is not whether DuPont should have foreseen the injuries exactly as it happened to Mrs. Bartlett." The instructions—and the law more generally—peg the duty to whether "a reasonably prudent corporation would have anticipated" that its actions or inactions would cause injury. Foreseeability in the context of the proximate cause jury instructions

similarly looks to DuPont's actions.  Put simply, these instructions turn on *DuPont's* conduct, not the particulars of Bartlett's individual circumstances.  To say otherwise and adopt DuPont's argument would make it virtually impossible to ever find preclusive effect in negligence claims. The key concept applicable here is that DuPont's conduct impacted the Plaintiffs in virtually identical ways—contamination of their water supplies with a carcinogen.  The district court was correct to conclude that the "facts relating to DuPont's negligence were virtually identical" across the four trials.

In sum, we are not persuaded by DuPont's contention that near factual identity on the Plaintiffs' water district, location, exposure, timing, and toxicity is necessary and controlling— instead of evidence of DuPont's conduct.  But even if that were the standard, we are not convinced that the Plaintiffs here failed to cross that threshold.  DuPont's emphasis on the factual differences between Travis Abbott's case and those in the *Freeman* and *Vigneron* trials overlooks the factual similarities between Abbott and the plaintiff in *Bartlett*.  The record shows that Abbott and Bartlett were exposed to more than 0.05 ppb of C-8 in the Tuppers Plains-Chester Water District for overlapping periods of time.  (R. 33-2, Expert Report, PageID 343–44; MDL R. 2807-8, Expert Report, PageID 42884)  Bartlett drank C-8 contaminated water in that district from 1983 to 1989 and 1994 to 2004, while Travis Abbott was exposed from 1983 to 1998 and again from 2000 to 2004.  The roughly ten years of corresponding use in the same water district and similar exposure levels undercut DuPont's claim that the juries were not considering comparable facts relevant to duty, breach, and foreseeability.  Nor does the record support DuPont's contention that its knowledge of contamination in the *Vigneron* and *Freeman* cases sufficiently distinguishes the prior jury trials.  DuPont argued in both *Bartlett* and *Abbott* that it did not know it had contaminated their water and that the contamination did not exceed its internal guidelines.  (R. 188, Jan. 24, 2020 Trial Tr., PageID 7684)  Nevertheless, the *Bartlett* trial resulted in a jury verdict for Bartlett.  The factual identity factor supports the district court's application of collateral estoppel.

The next question is whether the resolution of the precluded issues was necessary to the outcomes in the prior cases.  *Goodson*, 443 N.E.2d at 981.  There is little doubt that the jury trials' decisions on duty, breach, and foreseeability were necessary to each of the verdicts for the

earlier Plaintiffs on their negligence claims. *See Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984). Ohio applies the standard common law test for negligence claims, which requires a finding on each of those elements. *See id.*

And finally, we consider whether the prior cases reached final judgment on the merits and whether DuPont had a sufficient opportunity to litigate the issues in those cases. *See Walden*, 547 N.E.2d at 966 (quoting *Hicks*, 369 N.E.2d at 778). As to actual litigation, the vast size of the MDL and individual case dockets belie any argument to the contrary. The record is clear that DuPont vigorously contested duty, breach, and foreseeability in all the prior trials. That DuPont settled the *Bartlett* case after the jury verdict and judgment, while the case was pending on appeal, does not change the preclusive effect of the district court's decisions in that case. *See Watermark Senior Living Ret. Cmtys., Inc. v. Morrison Mgt. Specialists, Inc.*, 905 F.3d 421, 426–28 (6th Cir. 2018); *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 484–85 (6th Cir. 2005); *see also* Restatement (Second) of Judgments § 13 cmt. g (1982) ("[T]hat the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion."). Thus, as to the Ohio law that governs issue preclusion, we conclude that the district court's analysis was correct.

### b. The *Parklane Hosiery* Considerations

In *Parklane Hosiery*, the Supreme Court provided additional guidance as to the doctrine of nonmutual offensive collateral estoppel. The unique parameters established by the *Leach* Agreement and the resulting MDL play the key role in applying the *Parklane* factors here.

We note first that the *Leach* Agreement created a limited, closed subset of possible plaintiffs from the larger, original *Leach* class. That subset was comprised only of those who had consumed contaminated water in specific water districts or wells for at least one year prior to 2005 and suffered from at least one of the six identified linked diseases, giving them sufficient indicia of injury to move forward with individual suits against DuPont.

The bargained-for exchange that the *Leach* Agreement established informs the application of collateral estoppel here.  Every class member agreed to release all claims related to diseases without a Probable Link finding and not to sue DuPont until the Science Panel completed its multiple-year study.  DuPont agreed not to contest general causation.[6]  In light of the benefits and concessions embodied in the Agreement, we disagree with our dissenting colleague's concern that it is fundamentally unfair to hold DuPont to the terms of the contract that it negotiated and has received the benefit of, especially when DuPont has mounted multiple challenges to the district court's interpretation of the Agreement to no avail.  *See In re Deepwater Horizon*, 744 F.3d 370, 377 (5th Cir. 2014) ("There is nothing fundamentally unreasonable about what BP accepted but now wishes it had not.").

Turning to the *Parklane* factors, we note as to the first factor that the MDL gave DuPont a greater measure of power over case scheduling than in normal cases:  few concerns about Plaintiffs using a "wait-and-see" approach for another successful action are possible when DuPont was able to select three of the six bellwether cases, including the first-tried case, *Bartlett*.  Second, the MDL structure presented DuPont with "every incentive," *Parklane Hosiery Co.*, 439 U.S. at 332, to defend itself vigorously in each of the early trials:  the first two bellwether cases tried were selected to inform the resolution of the 3,500 other pending cases, and DuPont knew that the third trial could continue to influence the remaining litigation.  Even after the global settlement, DuPont was aware that cases could continue to be filed—cases that would necessarily receive the same treatment as the MDL litigation.  As to the third *Parklane* factor, there is no concern about inconsistent verdicts with a previous judgment in favor of DuPont.  *Id*.  DuPont was not successful at any trial.

Importantly, the district court applied collateral estoppel only after three consistent jury verdicts for the Plaintiffs in the only cases to proceed to trial—the first of which was a bellwether selected by DuPont (*Bartlett*) and then another selected by the Plaintiff class (*Freeman*).  DuPont  chose to settle the remaining bellwether cases with the Plaintiffs.  As to the

---

[6]Under Ohio law, "[t]he concept of foreseeability is an important part of all negligence claims, because '[t]he existence of a duty depends on the foreseeability of the injury.'"  *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 928 (Ohio 2015) (second alteration in *Cromer*) (quoting *Menifee*, 472 N.E.2d at 710).

No. 21-3418        *In re E. I. du Pont de Nemours & Co.*        Page 17

fourth *Parklane* factor, then, DuPont presented no evidence that it had any procedural opportunities "that could readily cause a different result" in *Abbott* that were not available in the earlier trials. *Id.* at 331. None of the *Parklane Hosiery* considerations weigh against application of collateral estoppel in these circumstances.

Thus, as to all the factors governing issue preclusion or collateral estoppel, DuPont has received a full and fair opportunity for resolution of its issues—it had its day in court. DuPont's other objections—absence of advance notice of possible preclusive effect, the lack of consideration of representativeness in bellwether selection, and alleged promises of no preclusive effect—are not grounded in our collateral estoppel case law.[7] At bottom, DuPont argues that we should impose further rules constraining the use of nonmutual offensive collateral estoppel, beyond the federal common law and the Supreme Court's instructions in *Parklane Hosiery*. DuPont does not offer any cases that create a notice requirement for collateral estoppel, nor does it show that bellwether trials are prohibited from having such preclusive effect. *See, e.g.*, *Silvanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 359–60 (2d Cir. 2003) (allowing an informal bellwether case to have preclusive effect).

In a similar vein, although both DuPont and our dissenting colleague emphasize the applicability of *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997), that case involved a proposed trial plan for a *binding* bellwether trial, which informed the Fifth Circuit's stated concerns about applying the trial's outcomes to the full group of claimants. *Id.* at 1018–20; *see* Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials*, 88 N.Y.U. L. Rev. 439, 453–54, 456–57 (2013) (referencing *Chevron* and

---

[7]We agree with our dissenting colleague, the Manual for Complex Litigation, and the Federal Judicial Center that bellwether trials are most effective when "representative of the range of cases included in the MDL proceeding." Fed. Jud. Ctr., *Bellwether Trials in MDL Proceedings* 22 (2019); *see* Manual for Complex Litigation § 22.315 (4th ed. 2022). What makes a bellwether trial representative, however, is "litigation- and fact-specific." *Bellwether Trials in MDL Proceedings* at 22. Scholars have catalogued the many approaches that courts can take in selecting bellwether plaintiffs: letting one party pick, requiring the parties to agree, allowing the parties to use preemptory strikes against each other's selections, leaving the decision entirely to the court, or some combination thereof. *See generally* Fallon et al., *supra*; Loren H. Brown et al., *Bellwether Trial Selection in Multi-District Litigation*, 47 Akron L. Rev. 663, 670–84 (2015). With the parties' participation and cooperation, the district court here engaged in a lengthy bellwether plaintiff selection process that used some of the same mechanisms that Judge Fallon (who has overseen two MDLs involving over 30,000 claimants each) suggests are most effective. Fallon et al., *supra*, at 2349–50, 2364–65.

explaining that binding bellwethers are "conceptually separate" from issue preclusion because "the initial court running the bellwether determines its preclusive effect in advance of any subsequent litigation"). Neither *Parklane Hosiery*—in which the Supreme Court offers the clearest discussion on the limits and considerations for using offensive collateral estoppel—nor the other case law DuPont cites suggests that DuPont's asserted limitations on offensive collateral estoppel exist. *See Parklane Hosiery Co.*, 439 U.S. at 329–31.

Even were we to imagine a fairness issue related to notice, the record does not support DuPont's arguments. The district court did not promise that the general assumptions of litigation—including that issue preclusion is possible—would not apply to the bellwether trials. At most, the district court confirmed that the bellwether trials would not be "binding bellwethers," meaning that the results of those trials would not automatically be extrapolated to non-bellwether plaintiffs.[8] *See* Alexandra D. Lahav, *Bellwether Trials*, 76 Geo. Wash. L. Rev. 576, 609–10 (2008). The Supreme Court has instructed the courts that the factors articulated in *Parklane* offer the necessary constraints on the use of nonmutual offensive collateral estoppel. We cannot and do not follow DuPont's recommendation to create additional rules restricting the use of the doctrine. We affirm the district court's use of nonmutual offensive collateral estoppel in this case.

### 2. Application of Collateral Estoppel to the Ohio Tort Reform Act

DuPont also challenges the district court's use of collateral estoppel to preclude the application of the OTRA to Travis Abbott's negligence claims, but the basis for that argument is unclear. DuPont never asserted that the OTRA applied to Travis Abbott's claims, and there would be no grounds for such a contention. The OTRA cap on tort damages has a catastrophic injury exception for those who lose "a bodily organ system," Ohio Rev. Code § 2315.18(B)(3)(a), and no party has disputed that Travis Abbott's loss of both his testicles

---

[8]If a bellwether is "binding," the parties designate a subset of overall cases, the results of which are to be extrapolated to the broader whole. Generally, such a procedure requires that the parties "clearly memorialize" an agreement to be bound in future trials, no matter the result, to avoid certain due process concerns. *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1200 (10th Cir. 2000). That procedure was not employed in this MDL, where the parties agreed that the bellwethers would be treated as ordinary trials whose results could be used to inform settlement or the conduct of future trials.

qualifies his claims under this exception.  The only OTRA challenge in the district court came from the Abbotts, who argued that the law should not apply to Julie Abbott's loss of consortium claim.  The district court disagreed and entered an amended judgment applying the OTRA to reduce Julie Abbott's $10 million jury award to the OTRA cap of $250,000.  As the district court did not apply issue preclusion on its reduction of Julie Abbott's damages award and neither party has objected to that reduction, the OTRA is not at issue on appeal.

### C.  DuPont's Evidentiary Challenges Related to Specific Causation

In this appeal, DuPont frames its evidentiary challenges as three broad categories of claims.  First, DuPont argues that the district court erred in excluding expert testimony and evidence on the dose-response relationship between C-8 blood levels and testicular cancer. Second, it contends that the district court erred in allowing the Abbotts to offer expert testimony on specific causation that relied—as authorized by the *Leach* Agreement—on the conclusion of the Science Panel that the exposure threshold defining class membership was sufficient to cause testicular cancer.  Finally, DuPont asserts that the district court erroneously excluded all testimony on alternative causes of Travis Abbott's cancer.

These challenges are virtually identical to those DuPont raised in the *Bartlett* appeal that was subsequently withdrawn due to the parties' settlement.  DuPont argued in *Bartlett* that the district court erroneously interpreted general and specific causation pursuant to the *Leach* Agreement.  DuPont claimed it could not properly contest specific causation in Bartlett's case because it was prevented from offering evidence of Bartlett's C-8 dose and the likelihood that such a dose would cause kidney cancer.  The district court's order denying DuPont's motion for a new trial in *Bartlett* concluded that DuPont's "position on causation conflate[d] the . . . definitions . . . set forth in the *Leach* Agreement" and effectively sought to rewrite the provisions about the Probable Link Findings in a way that would allow DuPont to challenge general causation.  The court explained that DuPont's position would require plaintiffs not only to prove their individual dose but also whether that particular dose was sufficient to cause the linked disease.  Allowing that standard would mean that "the Probable Link Findings may not apply to a particular plaintiff, such as those plaintiffs who were in the lowest exposure groups."  In a dispositive order covering all MDL cases, the court concluded that the parties' bargain,

expressed in the unambiguous language of the *Leach* Agreement, is that Probable Link Findings apply to any class member with a linked disease. Therefore, a plaintiff is "not required to come forward with evidence proving that [her] individual dosage of C-8 [wa]s sufficient" to cause her disease.

Recognizing that DuPont's evidentiary claims in the Abbotts' case involved interpretation of the *Leach* Agreement—an issue that was already decided in *Bartlett*, *Freeman*, and *Vigneron*—the district court thoroughly explained that its decision on the proper interpretation of the Agreement in those three previous cases was "final and binding." That interpretation foreclosed DuPont's evidentiary arguments here and the district court therefore rejected the claims. That DuPont appealed *Bartlett* and its interpretation of the *Leach* Agreement, but subsequently withdrew its appeal, had no effect on the finality of the prior three decisions because "those previously appealable issues simply retained their finality for purposes of collateral estoppel." DuPont, the district court concluded, was precluded from raising these same arguments yet again.

In this appeal, DuPont did not challenge the aspect of the district court's order applying collateral estoppel to the interpretation of the *Leach* Agreement. It contested only the application of collateral estoppel to elements of the negligence claims and the OTRA, and its fairness and due process arguments were tailored to the tort claims, not the interpretation of the *Leach* Agreement. Nor did DuPont contest the district court's determinations that: the interpretation of the *Leach* Agreement was necessary to the outcome of the proceedings in the three earlier cases; the same relevant factual circumstances exist; the three cases reached a final judgment on the merits that retained finality even after DuPont withdrew its appeal; or that DuPont had an opportunity to litigate the proper interpretation of the *Leach* Agreement. Indeed, as the district court explained, DuPont's arguments about the *Leach* Agreement "have been made *numerous* times to this Court, as well as before the Sixth Circuit." By not challenging that aspect of the district court's collateral estoppel order in this appeal, the argument that the district court improperly applied collateral estoppel to the contract interpretation issue is forfeited. *See Guyan Intern., Inc. v. Prof. Benefits Adm'rs*, 689 F.3d 793, 799 (6th Cir. 2012). The district court's

interpretation of the Agreement thus remains binding and, as explained above, is dispositive of these evidentiary challenges.

DuPont's challenges, in any event, fail on their own merits. Evidentiary rulings are reviewed for abuse of discretion, *Hurt v. Com. Energy, Inc.*, 973 F.3d 509, 524 (6th Cir. 2020), which "occurs when the district court relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard," *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 533 (6th Cir. 2014) (quoting *Mike's Train House, Inc. v. Lionell, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006)). We address each challenge in turn.

### 1. Exclusion of DuPont's Dose-Response Testimony and Evidence

DuPont first challenges the district court's evidentiary decisions related to the dose-response relationship between testicular cancer and C-8 blood levels. It argues that the district court excluded "expert opinions on Mr. Abbott's dose and his specific resulting amount of increased risk" based on an erroneous interpretation of the *Leach* Agreement's general causation provision. DuPont asserts that the *Leach* Agreement preserves its right to contest specific causation, and the exclusion of expert testimony on dosage "gutted" that right. For the same reason, DuPont argues that the court erred in allowing the Plaintiffs to tell the jury that 0.05 ppb of C-8 is sufficient to cause Travis Abbott's cancer.

As discussed above, those arguments boil down to whether the district court properly interpreted the definition of general causation in the *Leach* Agreement, which undisputedly governs how the district court treated causation and dosage evidence. The Agreement gave the Science Panel a clear charge: focus on an identified community and a particular chemical to determine which diseases in the community are linked to C-8 exposure. Once the Science Panel announced such a link, DuPont could not challenge general causation for that disease ("that it is probable that exposure to C-8 is capable of causing" that particular disease) among class members. (MDL R. 820-8, PageID 11804) The *Leach* Agreement drastically limited the persons authorized to bring suit against DuPont through two factors—the condition of class membership (exposure to drinking water with 0.05 ppb of C-8 for at least a year) and satisfaction of the Science Panel's linked-disease finding (development of one of only six linked diseases).

The intersection of these two factors shows that the class bargained for and its members could expect that satisfying the Science Panel's linked-disease qualification would preclude the introduction of evidence to suggest that the 0.05 ppb exposure level was insufficient to cause that linked disease.

The district court based its evidentiary decisions that DuPont now seeks to challenge on the conclusion that DuPont's proffered evidence would undermine the bargained-for exchange memorialized in the *Leach* Agreement. Accepting DuPont's position that it could introduce evidence suggesting that exposure to more than 0.05 ppb of C-8 was necessary to cause testicular cancer would have deprived Travis Abbott of DuPont's agreement not to contest general causation once the Science Panel found a probable link. The tradeoff embodied in the Agreement is that the No Probable Link Findings for 50 diseases applies to all class members with any of those diseases, barring them from bringing suit against DuPont for non-linked diseases regardless of how their individual dose and their related risk of disease were reported and evaluated by the Science Panel. In other words, the vast majority of *Leach* class members would not be allowed to challenge the Science Panel's conclusions with dosage, individual evidence, or scientific advances for any of the 50 non-linked diseases—the benefit that DuPont now argues is its right to challenge for the six linked diseases. The district court did not abuse its discretion in concluding that DuPont could not elicit or proffer evidence that undermined the *Leach* Agreement's general causation bargain, including evidence of specific dosage.

As a factual matter, moreover, DuPont's argument that the district court prohibited "*all*" expert testimony and evidence on the dose-response relationship is incorrect. The court allowed opinions on dose-response data when that evidence was consistent with the *Leach* Agreement and the rules of evidence. The court's limitations on expert testimony targeted testimony that would have suggested Travis Abbott's exposure was too low to cause his cancer, evidence that violated the *Leach* Agreement. When such issues were not present, the district court allowed DuPont to reference Abbott's C-8 dose during the trial.

DuPont makes the broader argument that the district court's decision to allow testimony and statements asserting that the class membership threshold of 0.05 ppb of C-8 was sufficient to cause Abbott's cancer was an abuse of discretion. This is, yet again, an attempt to challenge a

foreclosed issue—the district court's interpretation of the *Leach* Agreement. And even if reconsideration of that interpretation were proper, the jury instructions were clear that specific causation was an issue left to the jury. The instructions stated that the jury must decide whether Abbott proved proximate cause ("an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred") to find for Abbott on his negligence claim. The district court did not instruct the jury that exposure to C-8 at 0.05 ppb for one year causes testicular cancer or that the 0.05 ppb represented a specific causation standard. The jury instructions instead explained that the jury should "treat as proven in this case that C-8 is capable of causing kidney cancer and testicular cancer." Notably, although the jury found for the Abbotts, it did not reach the same verdict for the Swartzes. This indicates the jury understood that specific causation remained at issue in the Abbott/Swartz trial. The district court did not abuse its discretion in denying DuPont's challenges to dose-response evidence.

### 2. DuPont's Other Evidentiary Challenges

DuPont next asserts that the district court should have excluded the Abbotts' specific causation expert because his testimony did not consider the Science Panel's dose findings or Travis Abbott's specific dose. The expert in question, Dr. Pohar, used differential diagnosis methodology to reach his conclusions. This methodology requires the physician to "consider[] all relevant potential causes of the symptoms and then eliminate[] alternative causes based on a physical examination, clinical tests, and a thorough case study." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 178 (6th Cir. 2009) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)). We have "recognize[d] differential diagnosis as 'an appropriate method for making a determination of causation for an individual instance of disease,'" *id.* (quoting *Hardyman*, 243 F.3d at 260), and have held that "a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid" under Rule of Evidence 702, *id.* (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999)). The record supports that Dr. Pohar ruled out many other potential causes of testicular cancer to reach a reasonable decision that C-8 exposure caused Abbott's case. And Dr. Pohar did not err in *ruling in* C-8 as a potential causal factor because he relied on the Science Panel's determination that C-8 exposure was a probable cause for a class member's linked disease (here, testicular cancer)—a

determination to which both parties were bound under the plain terms of the *Leach* Agreement. Allowing this testimony was not an abuse of discretion.

DuPont also argues that the district court improperly excluded "all opinions that Mr. Abbott's cancer was more likely caused by his pre-exiting germ cell neoplasia in situ (GCNIS) or idiopathic." But the record shows that the district court allowed DuPont to present testimony on alternative causes of Abbott's cancer. A DuPont expert testified as to evidence that GCNIS "nearly always" leads to testicular cancer. The district court did not allow that expert to testify that GCNIS was the more likely cause because the expert was qualified *only* as a general causation expert, not a specific causation expert. In fact, the court excluded him as a specific causation expert because he did not rule in C-8 exposure as a possible cause, which the *Leach* Agreement required. DuPont, therefore, did not put on a specific causation expert of its own. Nevertheless, the district court allowed DuPont to offer the testimony from multiple experts that most testicular cancer is idiopathic. DuPont was able to and did present evidence of alternate causes for Abbott's cancer but failed to present its own specific causation expert. The district court did not improperly prohibit DuPont from arguing specific causation at trial.

### C. The Directed Verdict on DuPont's Statute of Limitations Defense

DuPont challenges the district court's decision to reject its statute of limitations defense as a matter of law. Before the trial, the district court denied DuPont's motion for summary judgment and strongly suggested that Abbott had filed his tort claim for his 2015 testicular cancer within the two-year statute of limitations period. This finding arose from the court's conclusion that the earliest possible "triggering" date was when Abbott received a definitive testicular cancer diagnosis less than two years before he filed his lawsuit. After the parties presented their evidence to the jury, the district court rejected DuPont's arguments that claims related to the 1994 cancer were time-barred. Based on the overwhelming evidence that Travis Abbott did not know about the connection between testicular cancer and C-8 pollution from DuPont's Washington Works plant and the significant inferences necessary for a jury to conclude otherwise, the district court found that the Abbotts were entitled to judgment as a matter of law on the statute of limitations issue. DuPont challenges two aspects of this decision. First, Dupont argues that the statute of limitations for Abbott's 2015 cancer ran before he

received a definitive diagnosis on November 16, 2015. Second, whether Abbott had notice that DuPont was responsible for his bouts of testicular cancers was, according to the company, an issue properly left to the jury.

We review a district court's decision on a motion for judgment as a matter of law de novo, *Hurt v. Commerce Energy, Inc.*, 973 F.3d 509, 516 (2020), and apply the applicable state-law standards for evaluating such a motion in diversity cases, *Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 256 (6th Cir. 2011). A directed verdict is proper under Ohio law when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, reasonable minds could come to but one conclusion upon the evidence submitted." *Groob v. KeyBank*, 843 N.E.2d 1170, 1173 (Ohio 2006).

Our de novo review focuses on when Travis Abbott knew that his cancer diagnoses could be tied to DuPont's C-8 pollution. Under Ohio law, a cause of action for bodily injury from "exposure to hazardous or toxic chemicals" accrues when:

> the plaintiff is informed by competent medical authority that the plaintiff has an injury that is related to the exposure, or upon the date on which by the exercise of reasonable diligence the plaintiff should have known that the plaintiff has an injury that is related to the exposure, whichever date occurs first.

Ohio Rev. Code § 2305.10(B)(1). This law makes two pieces of knowledge critical to pinning down the accrual date: (1) knowledge of the injury; (2) knowledge that the injury is tied to a specific exposure. *Norgard v. Brush Wellman, Inc.*, 766 N.E.2d 977, 979–81 (Ohio 2002); *O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727, 727 (Ohio 1983). The Ohio Supreme Court has cautioned that this discovery rule "must be specially tailored to the particular context to which it is to be applied." *Norgard*, 766 N.E.2d at 979. The Ohio Supreme Court has also emphasized that "the underlying rationale for the statute of limitations" and public policy considerations require "a liberal interpretation of the time of accrual" for claims alleging latent bodily injuries. *Liddell v. SCA Serv. of Ohio, Inc.*, 635 N.E.2d 1233, 1238 (Ohio 1994).

The statute of limitations challenge to the claims for the 2015 cancer is straightforward to resolve. DuPont asserts that the district court should have left to the jury to decide whether Abbott knew of his 2015 testicular cancer at least by October 2015 when he received an

ultrasound and CT scan showing probable testicular cancer.  DuPont assumes that Abbott was aware of the link between testicular cancer and DuPont's C-8 pollution, arguing that his suit filed on November 14, 2017, therefore misses the statute of limitations by mere weeks.  The district court found as a matter of law that the earliest possible triggering date for Abbott's 2015 cancer was November 16, 2015, when Abbott received a definitive diagnosis of testicular cancer after an orchiectomy.

At trial, the Abbotts offered uncontroverted testimony from Travis Abbotts' treating physicians that the testicular cancer diagnosis was not finalized until November 16, 2015.  Although his doctors informed him earlier that the mass in his testicle was likely cancerous, the diagnosis was not official until his providers had reviewed a pathology report on the removed testicle.  Indeed, an earlier diagnosis without the pathology results, according to the uncontroverted testimony, would have contravened the standard of care.

Interpreting the statute of limitations as requiring Abbott to have sued DuPont before an official diagnosis, moreover, would raise significant fairness issues.  First, as the Abbotts argue, it would implicitly require Abbott to have had earlier and greater certainty about his medical diagnosis than his treating physicians had prior to November 16, 2015.  Second, such a reading would leave *Leach* class members with a difficult choice.  The Agreement prohibits class members without a linked disease from suing DuPont.  Had Travis Abbott sued without a definitive diagnosis, DuPont would have had every incentive to argue that he was not a qualifying class member under the *Leach* Agreement.  DuPont's position would leave *Leach* class members with a choice of suing before a definitive diagnosis with the risk of dismissal for lack of qualifying class membership or suing after with the risk of dismissal under the statute of limitations.  Neither the *Leach* Agreement nor the fundamental fairness concerns underlying Ohio's statute of limitations support such a result.  *Cf., e.g.*, *Schmitz v. Nat'l Collegiate Athletic Ass'n*, 122 N.E.3d 80, 87 (Ohio 2018).

The analysis is more fact-intensive for the 1994 cancer than that for the 2015 cancer.  There is no debate that Travis Abbott knew of his 1994 cancer well over two years before suing DuPont.  The issue is instead when, pursuant to Ohio's discovery rule, Abbott became or should have become aware of the link between that cancer and DuPont's C-8 discharges.

Abbott argues that the statute of limitations began to run as to his 1994 cancer when he actually encountered information that did or should have made him aware of the link between C-8 and the cancer, which he says occurred in October or November of 2015. DuPont suggests that Abbott's actual knowledge of a potential link between C-8 and his cancer is not what triggered his claim's accrual. Rather, there was media coverage of the link between C-8 and testicular cancer and other notice sufficient to make a reasonable person in Abbott's position aware that his cancer was related to C-8 before the fall of 2015.

Abbott's witnesses consistently presented facts to the jury showing that despite media coverage and some relatives' independent lawsuits against DuPont, Abbott was not aware of the connection between testicular cancer and DuPont's C-8 pollution. Abbott testified that he learned about the connection between his cancer and C-8 only a few weeks before filing his lawsuit, when his father told him about a TV ad discussing C-8's tie to testicular cancer and his administrative assistant suggested that he consult a lawyer on the issue. He further testified that he had not heard about the Science Panel's findings, did not receive notices about a link between C-8 and testicular cancer, and did not subscribe to or read any newspapers discussing the link to C-8.

DuPont did not offer evidence at trial directly refuting the consistent evidence regarding Abbott's lack of knowledge about the link between his cancers and C-8. DuPont presented some circumstantial evidence to support its assertion that Abbott did or should have known about the connection to C-8. For instance, when cross-examining Travis Abbott, DuPont elicited testimony about his 2006 C-8 Health Project paperwork, which included questions about testicular cancer and indicated that the Science Panel was looking into the disease's relationship to C-8 pollution (though, of course, in 2006, there was no established probable link between testicular cancer and C-8). DuPont also provided evidence of local newspaper coverage of both the *Leach* Settlement Agreement and the Science Panel's decisions. At several points, DuPont questioned Travis Abbott and other witnesses about the fact that some members of Abbott's extended family had already sued DuPont on claims related to other linked diseases.

But Ohio's discovery rule does not require that plaintiffs read the news or assume that they have knowledge of their family's legal affairs. Instead, "the statute of limitations begins to

run once the plaintiff acquires additional information of the defendant's wrongful conduct" that does or should put that plaintiff on notice that his injury is related to the conduct.[9]  *Norgard*, 766 N.E.2d at 981; *see Browning v. Burt*, 613 N.E.2d 993, 1006 (Ohio 1993) (statute of limitations for negligent credentialing claim against hospital began to run when plaintiffs viewed a television program making them aware that other ex-patients suffered from abnormalities similar to theirs); *Vaccariello v. Smith & Nephew Richards, Inc.*, No. 76594, 2000 WL 1060649, at *5 (Ohio Ct. App. Aug. 3, 2000), *aff'd*, 763 N.E.2d 160 (Ohio 2002) (statute of limitations for bodily injury claim began to run when plaintiff viewed television program in which she learned that a device implanted in her back could be the source of her injury).  The question, then, is not whether there was media coverage of C-8's link to testicular cancer, or whether other members of Abbott's family brought claims against DuPont.  The question is whether Abbott encountered information that did or should have put him on notice that his cancer was connected to C-8.  DuPont did not present evidence that Abbott ever received such information.  The district court drew a helpful analogy to the *McDonnell Douglas* burden shifting framework common in employment discrimination cases when denying DuPont's motion for summary judgment.  DuPont first made a prima facie case that the statute of limitations barred Abbott's claims because the 1994 cancer and news about the link between C-8 and testicular cancer occurred well over 2 years before Abbott filed suit.  Abbott then rebutted that assumption by offering proof that he did not know about the link between C-8 and testicular cancer.  DuPont did not meet its burden of challenging that rebuttal.

The district court's reasoning is sound.  While the jury normally can make credibility judgments, submitting the statute-of-limitations issue to them would have required them to "draw inference upon inference upon inference" to find for DuPont.  The record evidence pointed in one direction:  Abbott filed his claim less than two years after he became aware of the

---

[9]Our dissenting colleague cites *Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992), which found that constructive knowledge of facts was sufficient to start the statute of limitations running for a medical malpractice claim (not a bodily injury claim).  Even if applicable, this standard is not inconsistent with the Ohio discovery rule as the district court applied it: like a plaintiff bringing a bodily injury claim, a plaintiff bringing a medical malpractice claim must encounter some information that does or should put them on notice.  *See Allenius v. Thomas*, 538 N.E.2d 93, 133 (Ohio 1989); *see also Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1300-01 (Ohio 1984) (finding that a party has constructive notice to trigger a statute of limitations if he "*has knowledge of such facts* as would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry" and "fails to do so" (emphasis added)).

connection between C-8 and his testicular cancers.  We therefore affirm the district court's judgment on the statute of limitations.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court in full.

_____

## CONCURRING IN PART AND DISSENTING IN PART

_____

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.

Throughout the last decade or so, this multidistrict litigation has generated more than ten thousand record entries, two appeals, and five month-long jury trials. The district court has done a commendable job, and the majority affirms the court's relevant decisions in full, as they relate to Travis and Julie Abbott.

Respectfully, I must dissent. I would hold that, in mass-tort multidistrict litigation, fundamental notions of due process require an additional safeguard before a court can issue a collateral estoppel order against a defendant based upon a small number of potentially unrepresentative bellwether trials. I would also hold that the general verdicts in the three early trials lacked the specificity to bind the thousands of remaining cases. Finally, I would hold that the district court erred, in part, by taking away from the jury DuPont's statute-of-limitations defense.

For the reasons expressed below, I concur in Part II.B of the majority opinion but must respectfully dissent from Parts II.A and II.C.

## I.

I'll begin with Part II.A. I agree that nonmutual offensive collateral estoppel does not necessarily violate due process in this context.[1] Nowhere in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979), did the Supreme Court create a categorical ban on that doctrine in mass-tort litigation. The Court, instead, used "fairness" as its guide to determine when the doctrine is appropriate. I also agree with the majority that the district court was not required to give DuPont advance notice that the bellwether trials could later have preclusive effect.

_____

[1]The district court and the majority use the term "collateral estoppel," also known as "issue preclusion." *Brownback v. King*, 141 S. Ct. 740, 747 n.3 (2021). Although issue preclusion is the "more descriptive term," *Yeager v. United States*, 557 U.S. 110, 119 n.4 (2009), I will refer to the doctrine as collateral estoppel for the sake of consistency.

That said, however, collateral estoppel was not appropriate in this case. The district court used plaintiff-specific verdicts, based on general verdict forms, from three early trials—as to which the court had told the parties from the outset that they would be informational and non-binding— to preclude DuPont from contesting certain liability issues in thousands of potentially different cases. For a court to apply offensive collateral estoppel against a defendant in a mass-tort multidistrict litigation such as this, due process requires an inquiry into the representativeness of the plaintiffs, as well as a faithful adherence to the collateral estoppel rules. Because neither happened in this case, the district court's sweeping estoppel order subverts DuPont's constitutional rights. I would reverse and remand.

## A.

It is foundational that all defendants, no matter how unsympathetic or heinous their conduct, retain the full force of constitutional due-process protections. In my view, in the mass-tort bellwether context, the Constitution requires that before a court issues a collateral estoppel order it must assure that the cases estopped are reasonably representative of the first cases tried. The district court here failed to do that—despite there being thousands of cases at stake—making its estoppel order fundamentally unfair to DuPont in violation of due process.

First, some background on the legal landscape. As the majority describes, in federal diversity actions, state law determines whether collateral estoppel may render a prior decision preclusive on an issue raised in a later case. In Ohio, issue preclusion applies when (1) the issue "was actually and directly litigated in the prior action;" (2) a "court of competent jurisdiction" decided the issue; (3) the "fact or . . . point" in question was "actually and necessarily litigated and determined" as part of a final judgment; (4) "the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action;" and (5) the party against whom estoppel is sought had a "full and fair opportunity" to litigate the issue in the prior action. *State ex rel. Jefferson v. Russo*, 150 N.E.3d 873, 875 (Ohio 2020); *Fort Frye Tchrs. Ass'n OEA/NEA v. State Emp. Rels. Bd.*, 692 N.E.2d 140, 144 (Ohio 1998); *State v. Williams*, 667 N.E.2d 932, 935 (Ohio 1996); *Walden v. State*, 547 N.E.2d 962, 966 (Ohio 1989). This doctrine conserves judicial resources and protects against inconsistent decisions by recognizing that parties should not be able to relitigate the same disagreement in perpetuity. *See Taylor v. Sturgell*, 553 U.S.

880, 892 (2008); *San Remo Hotel, L.P. v. City & County of San Francisco, Cal.*, 545 U.S. 323, 336–37 (2005).

But like all doctrines, it has its limits. In *Parklane*, 439 U.S. at 326, the Supreme Court considered whether a party could use what is called "nonmutual offensive collateral estoppel"— that is, whether a plaintiff can seek to estop a defendant from relitigating an issue that the defendant previously litigated and lost against a different plaintiff. The Court weighed the downsides of allowing the doctrine but ultimately concluded that "the preferable approach . . . is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion when it should be applied." *Id.* at 331. The Court held that, as a guiding principle, "offensive estoppel" should not be applied where it "would be unfair to the defendant." *Id.*

As an example of when it might be unfair, the Court instructed district courts to "avoid reward[ing]" a plaintiff "who could easily have joined in the earlier action" but chose not to "in the hope that the first action by another plaintiff" resolved favorably. *Id.* at 330–31. The Court noted that offensive estoppel may also be unfair where a defendant had "little incentive to defend [an initial case] vigorously," where there are inconsistent prior judgments, or where "the second action affords the defendant procedural opportunities [that were] unavailable in the first action." *Id.* at 330–31. In a footnote, the Court provided an example of when inconsistent prior judgments would render estoppel unfair:

> In Professor Currie's familiar example, a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover.

*Id.* at 330 n.14 (citing Currie, *Mutuality of Estoppel: Limits of the Bernhard Doctrine*, 9 Stan. L. Rev. 281, 304 (1957)). Finally, the Court noted that it did not exhaustively catalogue the factors a district court should consider when reviewing for fairness. *Id.* at 331 ("The general rule should be that . . . where, either for the reasons discussed above *or for other reasons*, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow [its] use . . . .").

In other cases, the Court has limited collateral estoppel when the doctrine is sought against the government, *United States v. Mendoza*, 464 U.S. 154, 162 (1984), or when there is an

intervening change in the controlling facts or legal principles in a case, *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) (gathering examples). And "of course," just as any other common law doctrine, collateral estoppel is "subject to due process limitations." *Taylor*, 553 U.S. at 891 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 797 (1996)).

Complicating matters here, though, is that multidistrict litigation ("MDL") courts often use a procedure called "bellwether trials" to help resolve mass-tort litigation, and, at least in theory, the results of those trials can bind future cases under ordinary principles of collateral estoppel. Bellwethers are preliminary trials meant to help the parties gather information, value the cases, test legal theories, and, ultimately, reach a global settlement with minimal costs. *See* Alexandra D. Lahav, *Bellwether Trials*, 76 Geo. Wash. L. Rev. 576, 577–78 (2008). In practice, their results are generally non-binding absent an agreement to the contrary between the parties. *See* Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2331 n.27, 2337 (2008). And for understandable reasons, there is usually a concerted effort to ensure that bellwethers are representative of the larger group of MDL plaintiffs. That way, the parties and the court can confidently and accurately draw inferences from them.**²** *See In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 348–49 (5th Cir. 2017) ("Bellwether trials are meant to produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis, and what range of values the cases may have if resolution is attempted on a group basis." ); Zachary B. Savage, *Scaling Up: Implementing Issue Preclusion in Mass Tort Litigation Through Bellwether Trials*, 88 N.Y.U. L. Rev. 439, 453 (2013) ("[B]ellwether trials are distinct from ordinary trials because the transferee court selects cases that are similar to the wider group of claims arising from the mass tort. These trials involve similar facts, claims, or defenses as the wider group of cases, and are meant to help achieve

---

**²**In the district court's words, the bellwether trials here were meant to "produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strengths of the claims . . . and what range of values the cases may have." [MDL 5285, PageID# 128541 (quoting *The Manual for Complex Litigation*, § 22.315)]. At another point, when the parties informed the court that they had settled several of the bellwethers, the court stated that it "was, to put it mildly, surprised" because "[f]or over three years the parties had taken the position that the purpose of the bellwether trials was to gather information regarding the valuation of cases." [MDL 4624, PageID# 100953].

global resolution of the litigation."); *see also Grundy v. FCA US LLC*, No. 2:20-CV-11231, 2021 WL 5485821, at \*1 (E.D. Mich. Nov. 22, 2021).

Now to the merits. In my view, due process requires an additional safeguard before a court can declare mass-tort preclusion on an issue of liability against a defendant: the court must ensure that the sample of bellwether plaintiffs is reasonably representative of the rest.[3] The Fifth Circuit's decision in *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997), is instructive. In *Chevron*, a mass-tort case involving an oil spill, the district court planned to conduct a "unitary trial" of 30 bellwether cases, with each side selecting 15 cases out of the 3,000 cases pending. *Id.* at 1019–21. The trial would be preclusive on both "general liability" and "general causation" for the remaining 2,970 plaintiffs. *Id.* at 1019–20. The Fifth Circuit rejected this plan on due-process grounds because it contravened "fundamental fairness" to impose widespread liability against Chevron based on the results of a non-representative sample of plaintiffs. *Id.* at 1019–21. The Fifth Circuit explained that, without a sufficient number of representative trials, the district court's trial plan lacked "the minimum level of reliability." *Id.* at 1020–21; *see id.* at 1019 (noting that the "core element" of bellwether trials is "representativeness"). The court held: "[B]efore a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected." *Id.* at 1020.

The Sixth Circuit has not had the occasion to address the due-process restrictions on bellwethers. But in the class-action context, we have described bellwethers as "a small number of . . . plaintiffs, who can adequately represent the class, test their claims and legal theories first, before proceeding with the rest of the class." *Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 977 n.2 (6th Cir. 2017). It appears that scholars agree with *Chevron* that bellwether trials should be representative, and that a small sample size of bellwether trials has the potential to prematurely "lock in" outlier jury findings. *See, e.g.*, Fallon, *supra*, at 2344 (noting that a "bellwether trial is most effective when it can accurately inform future trends and effectuate an

---

[3]Only two of the three cases that were tried before *Abbott-Swartz* were bellwether trials. But for ease of reference, I will refer to all three as "bellwether trials" and the plaintiffs in them as "bellwether plaintiffs."

ultimate culmination to the litigation," and that parties should catalogue the entire universe of MDL cases to minimize the risk of trying an anomalous bellwether case); Savage, *supra*, at 463–64 (arguing that collateral estoppel should apply in mass tort litigation but only after "defendants [have] lost a substantial number of bellwether trials," and that the court must "ensure[] that the bellwether trials involved a wide range of plaintiffs—not just the most sympathetic ones"); Byron G. Stier, *Another Jackpot (in)justice: Verdict Variability and Issue Preclusion in Mass Torts*, 36 Pepp. L. Rev. 715, 739–43 (2009) (exploring "the possibility that the first verdict [in a multidistrict litigation] would be inconsistent with subsequent verdicts"); *see also* Meiring de Villiers, *Technology Risk and Issue Preclusion: A Legal and Policy Critique*, 9 Cornell J.L. & Pub. Pol'y 523, 524 (2000) ("Liberal application of collateral estoppel in product liability . . . has been criticized for putting the survival of entire industries at risk based on a single, possibly erroneous, judgment."); *Ann. Manual Complex Lit.* § 22.315 (4th ed. 2022) (bellwethers are meant "to produce reliable information about other mass tort cases, [so] the specific plaintiffs and their claims should be representative of the range of cases").

I would adopt *Chevron*'s approach and find that it is fundamentally unfair for a small, non-representative sample of bellwether plaintiffs to bind a defendant in thousands of future cases. *Parklane* makes it clear that even when the collateral estoppel requirements are met (which I question here), the invocation of the doctrine should not be allowed if it would be unfair. *Parklane*, 439 U.S. at 331; *see Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 600 (2d Cir. 2021) ("Nonmutual offensive collateral estoppel . . . cannot be applied if it would be unfair to the defendant."); *Merial, Inc. v. Sergeant's Pet Care Prod., Inc.*, 806 F. App'x 398, 406 (6th Cir. 2020) ("Courts also must ask, whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." (quotation marks omitted)); *Marlene Indus. Corp. v. N.L.R.B.*, 712 F.2d 1011, 1017 (6th Cir. 1983) (collateral estoppel must be "qualified or rejected when [its] application would contravene an overriding public policy or result in manifest injustice" (citation omitted)); *Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 125 (D.C. Cir. 1984) (where nonmutual offensive collateral estoppel is requested, "'fairness' gains special importance").

Here, the district court made no effort to ensure representativeness in its estoppel order. Neither of the two bellwether trials (*Bartlett* or *Freeman*) appears to be representative of the thousands of then-remaining cases. Nor do they appear to be representative of Abbott's case. Although there was some surface-level discussion of "representativeness" very early on in the MDL proceedings, [MDL 30, PageID# 172; MDL 34, PageID# 218–19; MDL 194, PageID# 3694], the district court ultimately allowed the parties to each select three of their strongest cases for bellwether trials. And the third trial, *Vigneron*, was chosen by plaintiffs after the court clearly rejected any requirement that it be representative. [MDL 4461, PageID# 96026–27]. Indeed, the court instructed plaintiffs to choose one of the "most severely impacted plaintiffs" to go first. [MDL. 4624, PageID# 100962; *see also* MDL 4461, PageID# 96026–27; MDL 4535-2, PageID# 98584 (plaintiffs' brief arguing that "the representativeness of the trial selections should be of no moment")].

The parties argue about whether there are outcome-determinative differences between the bellwether plaintiffs and Abbott. But as Judge Jones stated in her concurrence in *Chevron*, "the determination of reliable representative plaintiffs is difficult in a toxic exposure case"—it "involves such questions as quantity, geographic proximity, and temporal exposure to the toxic substance, comparative lifestyles, and physical manifestations of exposure." *Chevron*, 109 F.3d at 1022 (Jones, J., concurring). The fact remains that the district court here explored none of these questions in its estoppel order, despite having allowed the parties to cherry-pick "faces from the crowd of plaintiffs." *Id.* Moreover, the estoppel order impacts more than the Abbotts' case—it binds DuPont in countless other cases, too. And it continues to do so as new cases are filed.[4] [6th Cir. R. 69].

I am mindful that the fairness inquiry could be "potentially disruptive" if liberally applied and that collateral estoppel remains a useful trial-management device when used in appropriate cases. *Merial*, 806 F. App'x at 414. But in tension with those concerns is the fundamental and

---

[4]I am not confident that, in a toxic-tort MDL case involving thousands of plaintiffs, a small group of bellwether trials can ever be reasonably representative of the larger group. But the difficulty of ensuring representativeness is no reason to do away with the doctrine of collateral estoppel. It merely underscores that, as a practical matter, in rare cases such as this, collateral estoppel will usually be unfair because a court cannot confidently extrapolate findings relevant to, and preclusive upon, the remaining group of cases.

"essential prerequisite of due process" that a party have a full and fair "opportunity to be heard." *Richards*, 517 U.S. at 797 n.4. And it is Statistics 101 that a small, unrepresentative sample cannot yield reliable inferences as to a larger group. Because the district court here failed to assess the representativeness of the bellwether plaintiffs, the court's far-reaching estoppel order deprived DuPont of its constitutional right to have an "individual assessment of liability and damages in each case." *Chevron*, 109 F.3d at 1023 (Jones, J., concurring).

This is not to say that DuPont's three losses were outliers. It may very well be that, if given the chance to contest duty, breach, and foreseeability in each successive case, DuPont would still lose. But maybe not. Out of the 3,500 pending MDL cases, only three were tried. And about 75,000 potential lawsuits remained at the time of the estoppel order. Thus, it was too early, and the cases are perhaps too disparate, to tell.

The Abbotts claim that only *binding* bellwethers (where the parties agree in advance that the trials will be preclusive) must be representative. [Appellee's Br. 35]. But the Abbotts do not provide any case support or justification for the claim that binding bellwethers require due-process protections, but potentially binding informational bellwethers do not. The distinction makes no difference. Before a district court allows a bellwether trial to be preclusive on thousands of other MDL cases—whether by binding bellwether (before trial) or by informational bellwether (after trial)—due process requires an inquiry into representativeness.[5] The district court's concern for efficiency, while understandable, does not outweigh these overarching due-process concerns. *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841, 844–45 (6th Cir. 2020) (emphasizing that "enhancing the efficiency of the MDL as a whole" is not reason to disregard "the same legal rules that apply in other cases," and that "a party's rights in one case [cannot] be impinged to create efficiencies in the MDL generally"); *Chevron*, 109 F.3d at 1022 (Jones, J., concurring) ("Judges must be sensitive to stay within our proper bounds of

---

[5]The only case cited by the majority to support giving bellwethers preclusive effect is *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355 (2d Cir. 2003). But that case is a classic example of a binding bellwether, where the parties agreed in advance that the bellwether would decide certain issues in the remaining cases. *Id.* at 359. Moreover, *Silivanch* involved fewer than twenty-two plaintiffs, and the court's discussion of bellwethers was by way of background. The court did not in any way speak to the propriety of giving bellwethers (much less *informal* bellwethers) preclusive effect.

adjudicating individual disputes. We are not authorized by the Constitution or statutes to legislate solutions to cases in pursuit of efficiency and expeditiousness.").

In the end, the district court has done something that no other circuit court has, to my knowledge, allowed. It is one thing for a district court to bind a defendant in a single case after a handful of informational bellwether trials involving similarly-situated plaintiffs. It is quite another for a court to do so in thousands of future cases and without considering whether those cases involve legally divergent facts. And for a court to change course after it told the parties from the outset that the bellwethers would be informational and non-binding. [MDL 34, PageID# 218–19; *see* MDL 3973, PageID# 68182; MDL 4184, PageID# 80083; MDL 4382, PageID# 93365–66; MDL 4624, PageID# 100947].

In light of the "unique potential for unfairness" at play here, *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 248 (3d Cir. 2006), I would remand this case so that the district court can assess in the first instance the representativeness of the bellwether plaintiffs before applying collateral estoppel. *See Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 78, 84–85 (2d Cir. 2019) (remanding case for determination of whether application of nonmutual offensive collateral estoppel would be unfair).

## B.

I also cannot conclude that the black-letter requirements of collateral estoppel were satisfied in this case. Recall that collateral estoppel requires, among other things, that the precise issue raised in the later case was "actually and directly litigated in the prior action." *Russo*, 150 N.E.3d at 875. . Because the three bellwether trials here used general verdict forms and resulted in plaintiff-specific verdicts, the precise issues of duty, breach, and foreseeability raised in *Abbott* have not been actually litigated and forever decided.

The bellwether trials' general verdict forms are insufficient. "[A] jury speaks only though its verdict," and therefore general verdicts often lack the specificity required to create widespread issue preclusion. *Yeager v. United States*, 557 U.S. 110, 121–23 (2009) (emphasizing that "speculation" and "conjecture" have no place in the issue-preclusion analysis); *United Access Techs. v. CenturyTel Broadband Servs.*, 778 F.3d 1327, 1331 (Fed. Cir. 2015)

("When there are several possible grounds on which a jury could have based its general verdict and the record does not make clear which ground the jury relied on, collateral estoppel does not attach to any of the possible theories."); *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1483 (11th Cir. 1987) ("If the jury could have premised its verdict on one or more of several issues, then collateral estoppel does not act as a bar to future litigation of the issues."); *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997) ("Collateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding."); *see also In re Piercy*, 21 F.4th 909, 924–25 (6th Cir. 2021) (noting that collateral estoppel determinations cannot be based on gaps in verdict forms); *Black v. Ryder/P.I.E. Nationwide*, 15 F.3d 573, 581–82 (6th Cir. 1994) (clear error where court "engage[d] in pure speculation regarding the basis for the general verdict in the earlier case").

The verdict forms here asked the jury: "Do you find in favor of [the plaintiff] on his negligence claim?" [*See, e.g.*, Freeman, No. 2:13-cv-1103, R. 97, PageID# 1011]. Nothing more. Unlike a detailed special verdict, this type of general verdict does not provide insight into what the jury did, and did not, decide. It leaves the court with questions about what theories of negligence formed the basis for the jury's verdict, and what acts or omissions the jury believed were foreseeable by DuPont. And when we have reasonable doubt as to what the first cases found, we "err on the side of construing [those] prior ambiguous findings or holdings narrowly" for purposes of collateral estoppel. *United States v. United Techs. Corp.*, 782 F.3d 718, 729 (6th Cir. 2015); *see Merial*, 806 F. App'x at 413 (denying collateral estoppel, in the alternative, "on the basis of lack of clarity"); *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1289 (5th Cir. 1986) ("[I]f reasonable doubt exists as to what was decided in the first action, the doctrine of res judicata should not be applied."); *Harris v. Jacobs*, 621 F.2d 341, 343 (9th Cir.1980) ("If there is doubt on this score, collateral estoppel will not be applied.").

In *Dodge v. Cotter Corp.*, 203 F.3d 1190 (10th Cir. 2000), the Tenth Circuit reversed the district court's application of collateral estoppel in part because the verdict form did not specify which theories the jury relied upon in finding negligence. *Id.* at 1197–98. Similarly, in *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334 (5th Cir. 1982), the Fifth Circuit rejected the application of collateral estoppel where a general verdict form was "ambiguous as to certain key

issues," including "what the . . . jury decided about when a duty to warn attached." *Id.* at 343–44.  The verdict forms here suffer from the same flaw.

The Abbotts do not respond to this argument.  And the district court's cited authority is distinguishable.  *See Adams v. United States*, 2010 WL 4457452 (D. Idaho Oct. 29, 2010).  In *Adams*, the court informed the parties that the bellwether trial would have "preclusive effect," selected a "representative sample" of plaintiffs, and used a 47-question special verdict form to avoid ambiguity on the specific issues being decided.  *Id.* at *1–3.

Importantly, the three bellwether trials here also involved distinct, plaintiff-specific facts that bear heavily on negligence.  These include each plaintiff's susceptibility and location and the length and timing of his or her exposure to C-8, as well as DuPont's response and its knowledge about which locations were exposed to C-8 (and at what levels) and about the scientific developments regarding C-8 over the last fifty years.  Each of these factual variations can affect the duty and foreseeability elements of negligence.  *See Mussivand v. David*, 544 N.E.2d 265, 272 (Ohio 1989) ("The existence of a duty will depend on the foreseeability of the injury to appellee."); *Abrams v. Worthington*, 861 N.E.2d 920, 923 (Ohio Ct. App. 2006) ("In Ohio, the existence of a duty depends upon the foreseeability of injury to the plaintiff."); *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 636 (6th Cir. 2000) (same); *Est. of Ciotto v. Hinkle*, 145 N.E.3d 1013, 1019–20 (Ohio Ct. App. 2019) ("[F]oreseeability defin[es] the scope and extent of the duty." (quotation marks omitted)); *see also Palsgraf v. Long Island R.R.*, 162 N.E. 99, 100–01 (N.Y. 1928) ("The risk reasonably to be perceived defines the duty to be obeyed . . . . [A plaintiff] must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected . . . .").  Any combination of these factual differences could lead a jury to find that a particular plaintiff's injuries were not reasonably foreseeable and, therefore, that DuPont did not owe or breach a duty of care.

Consider location.  Abbott grew up and lived in and around Pomeroy, Ohio, which is 56.9 river miles away from DuPont's Washington Works plant in Washington, West Virginia.  [Abbott, No. 2:17-cv-998, R. 192, PageID# 8292; R.33-2, PageID# 342–43].  During that time, his water was sourced from wells ranging anywhere from 14 to 56 miles away from source of C-8 emissions.  [Abbott R. 192, PageID# 8292; R.33-2, PageID# 342–43; R. 254-3, PageID#

14012]. While Bartlett sometimes drank water from the same source as Abbott (for the years she lived in and around Tupper Plains, Ohio), [Bartlett, No. 2:13-cv-170, R. 131, PageID# 4530, 4613–14], Freeman and Vigneron drank water sourced from wells much closer to DuPont, only about 1,500 feet away from the Washington Works plant, [Appellant's Br. 29]. Beyond that, as a general matter, the post-2017 plaintiffs, including Abbott and Swartz, appear to have lived farther away from DuPont's plant than the plaintiffs in the earlier trials. [*See* MDL 5208, PageID# 125922–24, 125934–38]. Swartz, for example, lived outside the water districts listed in the Leach Agreement and premised her negligence claim on periodic exposure to C-8, claiming that she occasionally drank contaminated water when visiting the homes of others and during a one-year part-time job. [MDL 5208, PageID# 125922–24; MDL 5278, PageID# 128443–44; Swartz, No. 2:18-cv-136, R. 51-10, PageID# 1411].

If divergent facts in later cases could lead juries to reach different conclusions, then collateral estoppel is inappropriate. *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 491–92 (6th Cir. 2021) (finding collateral estoppel inapplicable in a contract dispute because the issue was not "identical" to one that had already been litigated, and noting that an issue cannot be defined "at too high a level of generality" such that it "overlooks the changed facts across" cases); *Est. of Van Dyke by Van Dyke v. GlaxoSmithKline*, 2006 WL 8430904, at *5 (D. Wyo. Nov. 1, 2006) (declining to apply collateral estoppel where each case involved "different facts, doses, time frames, diagnoses, warnings and research"); *Dopson-Troutt v. Novartis Pharms. Corp.*, 2013 WL 5304059, at *2 (M.D. Fla. Sept. 20, 2013) (rejecting collateral estoppel in a toxic exposure case because the plaintiff failed to address whether "the scientific knowledge relevant in [the second case] . . . would be different" from that in the prior trials).

While there are undoubtedly some similarities among Abbott, Bartlett, Freeman, and Vigneron, there are also plenty of legally significant factual differences that I cannot overlook. *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 174 (1984) (factual differences must be of "no legal significance whatever" for collateral estoppel to apply). But even if I did agree that the differences in *Abbott* have no legal significance at all, I am equally concerned about the thousands of other potentially differently situated plaintiffs who stand to benefit from the court's estoppel order. The district court erred by disregarding these differences.

The verdicts in those early cases did not, as the district court held, "ma[k]e clear that the duty DuPont breached was to the *entire communities* surrounding its Washington Works plant and not just to specific customers of individual water districts." [MDL 5285, PageID# 128574 (emphasis added)]. The juries were asked only about negligence with respect to the particular plaintiff, or someone in the position of the plaintiff. [*See, e.g.*, Freeman R. 97, PageID# 1011 (Verdict Form); R. 102, PageID# 1050 (Jury Instructions) (in deliberating on "the existence of a duty," consider whether a "reasonable prudent person would have foreseen at the relevant time that injury was likely to result to someone in Mr. Freeman's position"); Vigneron, No. 2:13-cv-136, R. 195, PageID# 8617 (same); Bartlett R. 139, PageID# 6205 (same)]. The juries were never instructed about a "community" theory of negligence. And even if they had been, the general verdict form would still have left it unclear if that theory served as the basis for their decision. *See Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1287 (10th Cir. 2005) (district court may not, after a verdict, "embrace[] [a theory] not addressed by the jury" because that would be stepping "into the impermissible realm of speculation as to what the jury actually determined").

I also anticipate that this preclusive effect essentially guts the utility of informational bellwether trials. After today, it seems that parties can do nothing—other than not conduct bellwethers at all—to prevent an informational bellwether from becoming binding. Parties can't purposefully select unrepresentative plaintiffs to go first, nor can they purposefully use general verdict forms so that preclusion does not attach. *See* Savage, *supra*, at 464 (suggesting as much); [Appellant's Br. 24]. I suggest that the age of bellwethers will come to an end, as any residual benefit of conducting one will be outweighed by its now-endorsed preclusive consequences.

For all these reasons, the Abbotts cannot show that the three bellwether trials "actually" decided "the precise issues" of duty, breach, and foreseeability for all future MDL cases. I would vacate the district court's estoppel order and remand.

## II.

I am pleased to concur in Part II.B of the majority's opinion, which concludes that the district court properly excluded portions of DuPont's expert testimony, properly admitted

Abbott's specific causation expert, and did not exclude all testimony on the potential alternative causes of Abbott's cancer.

I write separately on this point to press one caveat: evidence of a plaintiff's specific dosage or level of exposure to a contaminant is relevant to specific causation, and such evidence does not undermine DuPont's concession on general causation so long as the evidence is used in a way that questions the *likelihood*—and not the *capability*—of harm.[6]

According to DuPont, the Science Panel found "that the amount of risk varies greatly with dose, and that some of [the Panel's] data showed that only 'very high' blood levels of C8 materially increased an individual's risk." [Appellant's Br. at 34; *see* MDL 2813-4, PageID# 46017, 46019; Abbott R. 259-1, PageID# 18432–34]. That makes sense. Increased exposure generally means increased risk of harm. And not every person drinking water contaminated with C-8 over the course of fifty years and in different locations will have the same exposure levels. That's why in toxic exposure cases like this, relative risk analysis is often the meat and potatoes of expert opinions. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676–77 (6th Cir. 2011). Therefore, DuPont could have, in theory, elicited expert testimony pointing out that Abbott apparently had a low dosage level of C-8 in his bloodstream and that it was therefore *unlikely* that C-8 caused *his* cancer. That testimony would have squarely addressed specific causation, not general causation, and would have been admissible.

But that's not quite what DuPont tried to do in the district court. Despite DuPont's characterizations on appeal, from early on DuPont has consistently and repeatedly insisted that it could point out that a plaintiff's C-8 levels could be so low that C-8 was *incapable* of causing his or her cancer. [*See* MDL 1679, PageID# 22980–81; MDL 3972, PageID# 68167–74; MDL 4079, PageID# 71853–55; MDL 4226, PageID# 81635; MDL 4777, PageID# 108871–72, 108895; MDL. 5285, PageID# 128552; MDL 5294, PageID# 128750–58; R. 5305, 128936–39]. As the district court and the majority correctly describe, the Leach Agreement takes that kind of

---

[6]The Abbotts briefly argue (and the majority finds) that DuPont forfeited this argument because it "chose not to appeal the district court's collateral estoppel decision on this issue." [Appellee's Br. at 18; *see id.* at 41]. Even if the Abbotts provided a developed forfeiture argument (they do not), their argument fails. The district court did not rely on the estoppel order in making its evidentiary rulings; rather, it relied on its interpretation of the Leach Agreement and the expert opinions specific to Abbott and Swartz.

testimony off the table. And even though the court prevented DuPont's proffered causation expert from opining that it was "more likely" that Abbott's cancer had alternative causes—which would appear permissible—there was still no error. DuPont's expert refused to rule in C-8 as a *possible* cause of Abbott's cancer, as the Leach Agreement required, and therefore his testimony was properly excluded. [MDL 5301, PageID# 128860–66; *see* MDL 4079, PageID# 71861 ("DuPont has contractually agreed that its experts must rule in C-8 as a possible cause of [a class member's linked disease]."); Abbott R. 65, PageID# 2065].

All in all, DuPont retained the right to call attention to a plaintiff's C-8 levels in order to contest whether C-8 *likely* caused that plaintiff's cancer. But, as explained, DuPont tried to do more than that at the district court. For that reason, I concur.[7]

### III.

I must dissent in part from Part II.C of the majority's opinion as well. Abbott did not file his federal lawsuit for his 1994 cancer until 2017, and there are good arguments that his claim is time-barred by Ohio's statute of limitations. The district court erred by taking that issue away from the jury.

As the majority explains, Ohio has a two-year statute of limitations on personal injury claims. Ohio Rev. Code § 2305.10(A). It reads:

> [A] cause of action for bodily injury . . . that is caused by exposure to hazardous or toxic chemicals . . . accrues upon the date on which . . . by the exercise of reasonable diligence the plaintiff should have known that the plaintiff has an injury that is related to the exposure.

*Id.* § 2305.10(B)(1). For the Abbotts' claim to be timely, it must have been brought no later than November 14, 2015, unless tolled.

---

[7]It does to some extent concern me, however, that the district court prohibited the jury from reviewing the Science Panel's findings, even though the jury asked to see them. [Abbott R. 187-1, PageID# 6857 ("Can we use/see the 2012 Science Panel Report?"); *see also id.* at 6857 (jury question stating that one juror refused to "consider as fact that the Science Panel determined drinking water containing .05 ppb . . . linked to testicular . . . cancer"]. The jury in the first bellwether trial, *Bartlett*, also asked to see the Science Panel's report, but the district court refused to provide it then as well. [Bartlett R. 146, PageID# 6496 ("Can we see the scientific report that determined 0.05 ppb")].

But in granting the Abbotts' motion for judgment as a matter of law, the district court erroneously required DuPont to present evidence of Abbott's *actual* notice of his injury. [Abbott R. 205, PageID# 10857–59; *see generally id.* at 10837–59; R. 241, PageID# 1222]. The court relied on its prior summary judgment decision, which stated that "constructive notice is not the applicable test." [MDL 5304, PageID# 128912; *see* Abbott R. 205, PageID# 10843]. The court held that DuPont did not present sufficient evidence that Abbott had "actually encountered" information to put him on notice of the potential link between C-8 and his testicular cancer. [MDL 5304, PageID# 128913].

That was wrong. The "should have known" language in the Ohio Revised Code confirms that sufficient evidence of constructive notice can be enough to start the clock. Ohio Rev. Code § 2305.10(B)(1); *see Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc.*, 238 F. App'x 159, 162 (6th Cir. 2007) (noting that, under Ohio law, the statute of limitations begins when a plaintiff "discovered or *should have* discovered" both his "injury" and that his injury "was the result of [defendant's wrongful conduct]" (emphasis added)); *Norgard v. Brush Wellman, Inc.*, 766 N.E.2d 977, 979 (Ohio 2002) ("[T]he discovery rule . . . provides that a cause of action does not arise until the plaintiff discovers, *or by the exercise of reasonable diligence should have discovered*, that he or she was injured by the wrongful conduct of the defendant." (emphasis added)); *Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992) ("[C]onstructive knowledge of facts, rather than *actual* knowledge of their legal significance, is enough to start the statute of limitations running under the discovery rule." (emphasis in original)). The Abbotts do not cite a case that says otherwise.

Evidence of Abbott's constructive notice included (1) that, through local media coverage, it was widely publicized—often on the front page of newspapers—that C-8 was linked to testicular cancer; (2) that Abbott released his testicular cancer information to the "C-8 Health Project" in 2006 to determine if his health had been affected by drinking water containing C-8; (3) that by early 2015, his grandparents, his secretary, and about 3,500 individuals in his surrounding area had sued DuPont for their linked diseases; and (4) that Abbott was a high school principal at a school that held a public meeting about the Science Panel's findings. [Appellant's Br. 50–53; Appellant's Reply B. 23]. Abbott, of course, denies that he ever knew

C-8 could cause testicular cancer until two weeks before he filed suit.  But self-serving denials are not enough to take a triable issue away from a jury when contradictory circumstantial evidence exists.

Though perhaps weak, there was sufficient evidence of Abbott's constructive notice as it relates to his 1994 cancer to give the statute-of-limitations issue to the jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[T]he weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *see Groob v. KeyBank*, 843 N.E.2d 1170, 1173 (Ohio 2006) (directed verdict is proper when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, reasonable minds could come to but one conclusion upon the evidence submitted" (quotation marks omitted)).  In other words, a reasonable jury could have found that a person in Abbott's position exercising reasonable diligence would have been on notice about his injury and his claim against DuPont prior to November 14, 2015 (two years before he filed suit).

With regard to Abbott's 2015 cancer, however, I agree with the majority that the statute of limitations did not begin to run until after a pathologist removed and examined Abbott's mass and confirmed that it was cancerous.

## IV.

For the foregoing reasons, I would reverse the district court's grant of collateral estoppel, as well as the court's grant of judgment as a matter of law as it relates to Abbott's 1994 cancer. I respectfully dissent from those portions of the majority opinion and judgment.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-3418

IN RE:  E. I. DU PONT DE NEMOURS AND COMPANY
C-8 PERSONAL INJURY LITIGATION.
_____

TRAVIS ABBOTT; JULIE ABBOTT,

    Plaintiffs - Appellees,

    v.

E. I. DU PONT DE NEMOURS AND COMPANY,

    Defendant - Appellant.

> **FILED**
> Dec 05, 2022
> DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, STRANCH, and DONALD, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED in its entirety.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk